[No. 46767–6.   En Banc.   May 21, 1981.]

THE STATE OF WASHINGTON, *Respondent*, v.
STEPHEN CONRAD JONES, *Appellant*.

*Brian Paul Coughenour,* for appellant.

*Grant S. Meiner, Prosecuting Attorney,* and *Kenneth L. Cowsert, Deputy,* for respondent.

WILLIAMS, J.—This is an appeal from a conviction of murder in the second degree. Because the case presents an issue of broad public importance, we accepted direct review. RAP 4.2(a)(4). We reverse the judgment of conviction and remand for a new trial.

According to testimony adduced at trial, on August 18, 1979, appellant Stephen Jones, a Canadian then aged 15, came over to Port Angeles from his home on Vancouver Island, British Columbia. While in Port Angeles he planned to stay with his uncle, who lived in the Doyle Apartments. He was accompanied by several friends.

Sometime on the evening of August 19, 1979, appellant and two of his friends looked in the window of one of the downstairs units at the Doyle Apartments. According to appellant, they saw Dudley Bates, the victim, and another male engaging in a homosexual act. The testimony showed that Bates was a mentally retarded person with Down's syndrome. He lived alone but was often visited by other developmentally disabled friends and by neighbors from the Doyle Apartments.

The next day, August 20, 1979, appellant and some of his companions apparently spent much of the afternoon drinking beer. During the course of this activity they spent some time in Bates' apartment. Eventually appellant and Bates found themselves alone in the apartment, with Bates dressed only in his underwear. Appellant described the next events as follows:

Appellant asked Bates, "Hey Dudley, just to be on the

curious side, are you gay or something?" Report of Proceedings, at 283. Bates responded by saying nothing, getting up to go into the kitchen, procuring a kitchen knife, and approaching appellant in a manner which appellant considered menacing. "He tried to get me, and I went like—and that is when he got [cut] my pinky finger here, I guess." Report of Proceedings, at 289. Bates then dropped the knife, and appellant pushed him away and picked it up. A struggle ensued, and Bates was stabbed. Bates then went into his bedroom. Appellant followed him "[t]o see if he was badly hurt", but a further struggle occurred there, and Bates was stabbed several more times. Report of Proceedings, at 290. Bates then left the room again, and appellant went up to his uncle's apartment. By the time an ambulance and police arrived to tend Bates, who by then was out on the lawn, appellant had left the premises. He was apprehended some minutes later by a state patrolman, about 50 or 60 yards from the Doyle Apartments.

Bates died of his wounds. A pathologist testified at trial that Bates had suffered nine cuts or stabs, two of which the doctor considered lethal.

After being advised of his rights and taken to the police station, appellant made a tape-recorded statement describing what had happened from the time he arrived in Port Angeles. The officer who conducted the questioning testified that before activating the recorder he told appellant that he wanted to tape the interview and that appellant gave permission for the taping. This colloquy was not itself recorded, however. The tape was ruled admissible by a trial judge at a suppression hearing and was later played to the jury at trial.

The juvenile court declined jurisdiction, and appellant was tried as an adult on an information charging second degree murder. The trial court refused to give instructions on manslaughter in the first or second degree as lesser included offenses. The court apparently concluded both that manslaughter was not a lesser included offense of murder and that in any event there was insufficient evi-

dence of the "reckless" or "negligent" culpability required in the respective degrees of manslaughter. The court also refused to give appellant's proposed "standing in the shoes" self–defense instruction, but did give appellant's voluntary intoxication instruction. Appellant took proper exception to the court's refusal to give his proposed instructions on manslaughter and self–defense.

Appellant also took exception to the admission of the tape–recorded statement which he made to the police 3 hours after the incident. He argued both that his statement had not been made voluntarily and that there was a technical violation of the privacy statute, which rendered the tape inadmissible. RCW 9.73.090(1)(b)(i). Finally, appellant objected to the admission of five photographs of the victim's body taken by the pathologist who performed the autopsy to determine the cause of death.

Appellant first argues that the trial court erred in refusing to instruct the jury that they could consider first degree manslaughter as a lesser included offense to the charge of second degree murder. Appellant requested the following instructions:

> If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, the defendant may be found guilty of any lesser crime, the commission of which is necessarily included in the crime charged, if the evidence is sufficient to establish the defendant's guilt of such lesser crime beyond a reasonable doubt.
>
> The crime of Murder in the Second Degree necessarily includes the lesser crime of Manslaughter.
>
> When a crime has been proven against a person and there exists a reasonable doubt as to which of two or more degrees that person is guilty, he or she shall be convicted only of the lowest crime.

Appellant's proposed instruction No. 2.

> A person commits the crime of manslaughter in the first degree when he or she recklessly causes the death of another person unless the killing is justifiable.

Appellant's proposed instruction No. 5. Appellant's

instruction No. 6 contained the proof requirements for the crime of manslaughter in the first degree and was likewise rejected by the court.[1]

The trial court evidently concluded that as a matter of law manslaughter could not be a lesser included offense to murder as those two crimes are defined in the new criminal code. RCW 9A.32. The court reasoned that the state–of–mind element of second degree murder ("intent to cause the death of another") is entirely different from the state–of–mind element of first degree manslaughter ("recklessly causes the death of another"). RCW 9A.32.050(1)(a); 9A.32.060(1)(a). Thus, manslaughter could not be a lesser included offense of murder because the two crimes are essentially unrelated.

■■ There are a number of problems with this reasoning. First, as demonstrated by numerous cases which were decided under the common law or prior statutes, murder and manslaughter have always been considered related to the extent that instructions on both could be given in a case with appropriate evidence. *Brandon v. Webb,* 23 Wn.2d 155, 165, 160 P.2d 529 (1945); *State v. Foley,* 174 Wash. 575, 580, 25 P.2d 565 (1933); *State v. Berge,* 25 Wn. App. 433, 607 P.2d 1247, *review denied,* 94 Wn.2d 1016 (1980); *State v. Crudup,* 11 Wn. App. 583, 524 P.2d 479 (1974). Moreover, in a case with appropriate evidence arising under the new criminal code, at least one division of the Court of Appeals has held it to be error to refuse to give the first degree manslaughter instruction, as well as instructions on first and second degree murder. *State v. Berge, supra; and see* WPIC 4.11, and comment thereto, 11 Wash. Prac. 40–41 (1977).

Second, the various homicide crimes in RCW 9A.32 are

---

[1]RAP 10.4(c) provides that any proposed instruction be set out in the proponent's brief or an appendix thereto. This directive is not optional but is an obligation with which the failure to comply may result in the imposition of sanctions. RAP 1.2(b). In this case appellant's proposed manslaughter instructions were not included in his brief, an omission which caused unnecessary inconvenience to the members of the court.

defined in part by reference to the *kinds of culpability* set forth in RCW 9A.08.010(1). The statute further provides:

(2) Substitutes for Criminal Negligence, Recklessness, and Knowledge. When a statute provides that criminal negligence suffices to establish an element of an offense, such element also is established if a person acts intentionally, knowingly, or recklessly. When recklessness suffices to establish an element, such element also is established if a person acts intentionally or knowingly. When acting knowingly suffices to establish an element, such element also is established if a person acts intentionally.

RCW 9A.08.010(2). The comments to the original draft of this section of the new criminal code explained:

[T]he four mental states are ranked or related in such a way that proof of any one mental state establishes all lower mental states. Thus, where an offense requires a mental state of criminal negligence, proof of intent would also establish criminal negligence, a *sort of "lesser included"* mental state.

(Italics ours.) Legislative Council Judiciary Committee, *Revised Washington Criminal Code* § 9A.08.020, Comment at 34–35 (1970).

It seems plain, therefore, that the drafters of the code contemplated that if intent were established in a criminal case, recklessness would be deemed also established. This approach resolves the trial court's difficulty over whether recklessness or intent are inconsistent mental states.[2] Accordingly, we hold that the trial court erred in deciding as a matter of law that first degree manslaughter cannot be a lesser included offense of second degree murder under the current criminal code. Indeed, the State does not seriously dispute this point on appeal and argues instead that

---

[2]*State v. Hanton*, 94 Wn.2d 129, 614 P.2d 1280 (1980) is inapposite. The issue in that case was whether defendant was required to prove the elements of self–defense. In stating that self–defense and recklessness were inconsistent, the court was simply analyzing whether the defendant was required to prove a fact necessary to establishment of an element of the crime, a burden which is unconstitutional under *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970).

there was insufficient evidence to support a manslaughter instruction.

The jury was instructed that homicide is a voluntary act which may be either murder, manslaughter, excusable homicide, or justifiable homicide. Instruction No. 5. They were further instructed that self–defense is a defense to second degree murder. Instruction No. 6. Finally, the court gave the following instruction on intoxication:

> No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition, but whenever the actual existence of any particular mental state is a necessary element to constitute a particular kind or degree of crime, the fact of intoxication may be taken into consideration in determining such mental state.

Instruction No. 10; RCW 9A.16.090. This instruction permitted the jury to take the fact of intoxication into consideration in determining whether appellant could have formed the mental state of intent to cause another's death. RCW 9A.32.050(1); *State v. Berge, supra; State v. Colwash,* 15 Wn. App. 530, 550 P.2d 57 (1976).

The State contends that there was no evidence to support the intoxication instruction, but appellant testified repeatedly that he had been drinking beer and had drunk "nine or eleven" beers in the afternoon before the incident. Report of Proceedings, at 305. A witness who talked to appellant a few minutes after the incident "thought possibly he had been drinking". Report of Proceedings, at 235. A witness who talked to appellant in the decedent's apartment an hour before the incident noticed that "[t]he whites of his eyes were red and his eyes were very glassy. His speech was slurred." Report of Proceedings, at 122. After his apprehension soon after the commission of the crime, appellant was placed for a time in the "drunk tank" at the police station. CrR 3.5 hearing; Report of Proceedings, at 35.

There were, then, two possible ways the jury could have decided that appellant lacked the intent necessary for a

conviction of second degree murder. They could have found either that he was so intoxicated as to be unable to form the intent to kill or, alternatively, that he acted in self-defense, but recklessly or negligently used more force than was necessary to repel the attack. *State v. Crudup, supra* at 591; *State v. Sill,* 47 Wn.2d 647, 289 P.2d 720 (1955).

■ We think it plain the evidence was sufficient for the court to give the intoxication instruction. Without the manslaughter instruction, however, the jury was required either to find appellant guilty of second degree murder or to acquit him altogether. The refusal to give the manslaughter instruction prevented appellant from presenting his theory that the killing was unintentional by reason of his intoxication. *See State v. Colwash, supra* at 532. This refusal was reversible error.

Since we must accordingly remand for a new trial, we need not address appellant's other assignments of error. In order to provide guidance for the trial court on retrial, however, we briefly consider those issues.

Appellant first contends that the trial court erred in declining to give his proposed instruction on self-defense. The court's instruction No. 6, which is substantially similar to WPIC 16.02, 11 Wash. Prac. 109 (1977), was given as follows:

> It is a defense to a charge of Murder in the Second Degree that the homicide was justifiable as defined in this Instruction.
> Homicide is justifiable when committed in the lawful defense of the slayer when the slayer has reasonable ground to believe that the person slain intends to inflict death or great bodily harm and there is imminent danger of such harm being accomplished.
> The slayer may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the slayer at the time.

Appellant excepted to the court's failure to give his proposed instruction No. 1, which was as follows:

> If the defendant at the time of the alleged assault upon

him as a reasonable and ordinarily cautious and prudent man, honestly believed that he was in danger of great bodily harm, he would have the right to resort to self defense, and his conduct is to be judged by the condition appearing to him at the time, not by the condition as it might appear to the jury in light of the testimony before it.

This instruction is apparently drawn from one affirmed in *State v. Miller,* 141 Wash. 104, 250 P. 645 (1926), and approved in *State v. Strand,* 20 Wn. App. 768, 781, 582 P.2d 874 (1978).

The applicable rule of law is plainly stated in *Miller,* at page 105:

If the appellants, at the time of the alleged assault upon them, as reasonably and ordinarily cautious and prudent men, honestly believed that they were in danger of great bodily harm, they would have the right to resort to self defense, and *their conduct is to be judged by the condition appearing to them at the time,* not by the condition as it might appear to the jury in the light of testimony before it.

(Italics ours.)

In our view, it requires a strained reading of *Miller* to conclude that the trial court's instruction No. 6 did not correctly state the law. The second paragraph of instruction No. 6 expressly included the words "under the same or similar conditions *as they appeared to the slayer at the time.*" (Italics ours.) As long as the jury is made aware that it must consider the circumstances as they appeared to the slayer, it is unnecessary to add the negative phrase "not by the condition as it might appear to the jury." The negative phrase adds nothing to the basic instruction, but merely restates the jury's task, and we decline to require as a matter of substantive law that the negative must always be included. Accordingly, we conclude that the court's instruction No. 6 was a proper statement of the law and permitted the jury to "stand in the shoes" of the appellant.

Appellant next contends that his statement to the police was not made with a knowing and voluntary waiver of his

rights under *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

Whether a juvenile has knowingly and voluntarily waived his *Miranda* rights is determined by a "totality-of-the-circumstances" approach. *Fare v. Michael C.,* 442 U.S. 707, 725, 61 L. Ed. 2d 197, 99 S. Ct. 2560 (1979); *Dutil v. State,* 93 Wn.2d 84, 606 P.2d 269 (1980); *State v. Luoma,* 88 Wn.2d 28, 558 P.2d 756 (1977).

> The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Fare v. Michael C., supra* at 725.

In the present case, appellant was not quite 16 years of age at the time he made his statement to the police. The record discloses he was given his *Miranda* rights in a police car shortly after he was taken into custody as a suspect in the Bates homicide. He was then driven to the Port Angeles police station. Although appellant was not taken to the juvenile detention facility, he was kept segregated from other prisoners at the jail at least until he made his statement. Although appellant did not request an attorney, he testified that he knew what an attorney was and that a lawyer had represented him on three previous occasions in Canada.

Appellant is a Canadian citizen who had been to the United States only once before. He testified he had dropped out of school in the 10th grade, had never studied the United States Constitution, did not understand the "rights" read to him by the police, and had never been read any statement of rights in encounters with the law in British Columbia.

This court has disapproved a full custodial interrogation of a juvenile in the absence of a juvenile officer. *State v. Luoma, supra* at 36. In that case, the court decided a juve-

nile was not prejudiced by the absence of the juvenile officer, since a statement made in the presence of such an officer was the same one made to police at the time of his arrest. *State v. Luoma, supra.* Here, by contrast, no juvenile officer was called at all.

On the other hand, appellant signed an "Advice of Rights and Waiver of Rights" card containing the *Miranda* warnings and an explicit warning to juveniles that any statement could be used in either juvenile or adult court. An officer testified at the suppression hearing that appellant was advised of his rights several times, appeared of normal intelligence and understanding, and had no observable disabilities that would prevent full understanding. Moreover, he was again advised of his rights at the beginning of the taped statement. At the suppression hearing the deputy prosecutor read the following exchange from the tape transcript:

> [Detective Vail:] "I can understand that Stephen, but the questions I was asking was do you understand those rights. You don't have to say a thing to me". Mr. Jones responds, "I understand them, I want to get it over with right now". Then Vail says, "Do you want to tell me the story as to what occurred this afternoon, is that correct?" Mr. Jones says, "Yes, I can tell you everything that happened". Officer Vail says, "Now with the rights and charges in mind have there been any promises, threats to induce you to make a statement", Jones, "No". Detective Vail, "Your doing this of your own free will"? Jones, "My own free will". Vail, "To clarify an attempt to resolve this issue and this is a voluntary statement"[.] Jones says, "Yes."

CrR 3.5 hearing; Report of Proceedings, at 71.

We think there is substantial evidence to support the suppression hearing judge's conclusion that appellant was neither a naive stranger to the legal system nor incapacitated at the time he was questioned. Appellant admitted he had voluntarily signed the waiver and made the taped statement. The judge could have believed the two officers who testified that they detected no hint that appellant was

intoxicated at the time he made the statement 3 hours after the crime. The judge also concluded the answers on the tape were responsive directly to the questions. Our review of the tape supports that judgment, and persuades us that appellant understood that he was entitled to remain silent.

Appellant also argues there was a violation of the privacy statute, RCW 9.73.090(1)(b)(i). That provision requires that when police are recording a statement of an arrested person, that person "shall be informed that such recording is being made and the statement so informing him shall be included in the recording". Appellant contends that the recording itself does not include the required statement and thus should not be admitted.

We have recently addressed this question in *State v. Cunningham*, 93 Wn.2d 823, 613 P.2d 1139 (1980), which established that tape recordings of statements to police by arrested persons must conform strictly to the statutory requirements and that recordings that do not so conform are inadmissible at trial. *State v. Cunningham, supra* at 830–31.

Although the examining policeman in the present case did not begin the tape with a statement that the recording was being made, not only was the tape recorder sitting on the table directly in front of appellant, but also the officer began one of his questions by saying "for purposes of this tape. . . ." In addition, in the middle of the tape–recording session, the telephone rang and the officer spoke into the receiver, saying "I'm right in the middle of an interview. . . . I'm on recording now, and this is all going on tape", while explaining to the party on the other end of the line that he could not talk at that moment. Under these circumstances, it is clear that not only did appellant know that the recording was being made but that the tape contains an adequate statement that a tape recording was being made. Accordingly, we hold that the tape recording conforms with the statute and is therefore admissible.

Finally, appellant contends that the admission of five photographs taken of the victim during an autopsy were so

prejudicial as to impair his right to a fair trial.

The test for admissibility of gruesome or unpleasant photographs of a victim is whether the probative value of the photographs outweighs their probable prejudicial effect. *State v. Adams,* 76 Wn.2d 650, 655, 458 P.2d 558 (1969), and cases cited therein. Moreover, the decision whether to admit such photographs rests within the discretion of the trial court, and such a decision will not be reversed on appeal absent a showing of abuse of discretion. *State v. Adams, supra* at 656–57.

In the present case, the State presented the trial court with 15 photographs of the victim. The judge rejected 10 photographs taken before the autopsy, stating that they were "gruesome and gory" and "have no probative value". Report of Proceedings, at 190–91. The photographs allowed into evidence, exhibits 31 through 35, showed the location and angles of the wounds in the victim's body. Supplemented by the testimony of the pathologist who performed the autopsy, the pictures could help to establish the cause of death and the location of the lethal wounds, facts relevant to the appellant's claim of self–defense. Thus, the photographs were useful both to illustrate the pathologist's testimony and to substantiate the State's theory that appellant did not act in self–defense. *See State v. Adams, supra* at 655.

Under these circumstances, we find no abuse of discretion by the trial court. The photographs admitted into evidence were relevant and probative, and the court properly excluded those photographs which it deemed overly prejudicial.

Reversed and remanded for a new trial.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, UTTER, DOLLIVER, HICKS, DORE, and DIMMICK, JJ., concur.

Reconsideration denied July 21, 1981.