[No. 3751–7–III.   Division Three.   July 30, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. KENNETH M. COLLINS, *Appellant.*

2

*Stephen E. Llewellyn* and *Lutcher & Llewellyn,* for appellant.

*Arthur R. Eggers, Prosecuting Attorney,* and *Marshall S.*

*Wolfram, Deputy,* for respondent.

MUNSON, J.—Defendant Kenneth Collins appeals his conviction of second degree murder. He alleges: (1) the court erred in admitting a handgun on the basis of a consensual search; (2) his *Miranda* rights were violated by subsequent statements of the police at the time the handgun was sought; (3) a statement given some 18 hours after his arrest was inadmissible; (4) the court erred in failing to give instructions on second degree manslaughter and self–defense; (5) there was insufficient evidence to support the verdict; and (6) cumulative error.

On September 1, 1979, at about 12:40 a.m., Collins turned to a man seated next to him in a tavern, and shot the man six times with a .38 caliber revolver. As the victim fell to the floor, Collins walked out the door. The victim died.

The police were called and three patrons identified Collins as sitting next to the victim; one saw the shooting and another identified Collins as having walked from the tavern with a gun in hand.

The investigating detective, Terry Thomas, knew Collins socially and knew he lived in a rooming house in Walla Walla. Thomas and another officer went to Collins' apartment and knocked on the door. Detective Thomas drew his gun and when Collins answered, arrested him,[1] handcuffed

---

[1]*Payton v. New York*, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980), decided subsequent to trial, held that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest unless justified by exigent circumstances. *See also State v. Cook*, 115 Ariz. 188, 564 P.2d 877 (1977); *People v. Ramey*, 16 Cal. 3d 263, 545 P.2d 1333, 127 Cal. Rptr. 629, *cert. denied*, 429 U.S. 929, 50 L. Ed. 2d 299, 97 S. Ct. 335 (1976). If *Payton* were applicable here, it might well require suppression of the weapon. However, we find that it is not applicable because it is not retroactive. *See State v. Counts*, 27 Wn. App. 773, 620 P.2d 1013 (1980), *review granted*, 95 Wn.2d 1018 (1981). Further, "exigent circumstances" as defined in *People v. Ramey, supra* at 276: "an emergency situation requiring swift

him, and gave him his *Miranda* warnings. Collins was wearing jeans and a white T-shirt, his appearance was disheveled, he was partially shaved, his eyes were watery, and there was an odor of alcohol on his breath, but his speech appeared to be balanced. His mannerism was calm and he appeared to be physically coordinated. The officers informed him he was charged with assault. Collins told the officers he did not wish to make any statement, whereupon Detective Thomas said it would be very helpful to the police if they had the gun that was used in the shooting. Collins volunteered to get it and without apparent difficulty, while his hands were handcuffed behind his back, he led the officers down a narrow stairway into his landlady's apartment. There, Collins asked the landlady to go back into her bedroom and, closing the bedroom door, directed the officers to a linen closet in the bathroom where they found a Colt Cobra .38 caliber pistol. The gun contained six spent shell casings.

Collins was taken to jail, where he slept, with one short interruption, for over 18 hours. In the early evening, he was brought to an interrogation room where he was again given his *Miranda* rights by Detective Thomas. Collins affirmed his understanding of those rights. When asked if he would discuss the matter with Detective Thomas, he responded he was "always willing to talk" to Detective Thomas. Collins went on to tell Detective Thomas he had been ripped off twice in the last 2 weeks. Collins said the bartender at another tavern had given him $100, in five $20 bills, which he had been keeping for Collins; and in the tavern where the shooting occurred, Collins was drinking coffee and had the money on the bar. While his recollection was hazy, he believed the man sitting next to him made a grab for the

---

action to prevent imminent danger to life or serious danger to property, or to forestall the imminent escape of a suspect or destruction of evidence", might be applicable here. *See also Warden v. Hayden,* 387 U.S. 294, 18 L. Ed. 2d 782, 87 S. Ct. 1642 (1967), where "hot pursuit" might provide such justification. *Cf. State v. Hendricks,* 25 Wn. App. 775, 610 P.2d 940 (1980). However, under our analysis, we need not reach this issue.

money, as well as his wallet, and he thought he had seen the flash of a knife in the victim's possession. Collins told Detective Thomas he could remember the noise of shooting and the fire, but not the shooting itself. He then remembered going home and putting the gun in the bathroom linen closet.

We shall discuss the assignments of error as they occurred chronologically during the pretrial and trial proceedings.

*Admissibility of the handgun and Collins' statement.*

The trial court admitted the handgun on the basis that it was the result of a consensual search. The United States Supreme Court has distinguished between the standards to review the rights protected under the Fourth Amendment and those protected under the Fifth Amendment. *Schneckloth v. Bustamonte,* 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); *cf. State v. Murray,* 86 Wn.2d 165, 543 P.2d 332 (1975) (distinguishing between the standards where the Fourth and Sixth Amendments of the federal constitution are involved). This distinction is based upon the premise that the Fourth Amendment serves: "different constitutional values—values reflecting the concern of our society for the right of each individual to be let alone", *Schneckloth v. Bustamonte, supra* at 242, while Fifth Amendment rights serve to protect a fair criminal trial and are an adjunct to the ascertainment of the truth. *Schneckloth v. Bustamonte, supra* at 241.

We perceive Detective Thomas' request for the gun was improper under the Fifth Amendment, not the Fourth. In *State v. Dennis,* 16 Wn. App. 417, 558 P.2d 297 (1976),[2] an

---

[2] "[W]hen a criminal defendant challenges the admissibility of his or her statements made to law enforcement officials the Fifth Amendment issues are to be considered first. Only if the person's statements are deemed voluntary for Fifth Amendment purposes is a Fourth Amendment inquiry warranted." *United States v. Alexander,* 428 A.2d 42, 47 (D.C. 1981), citing *Rawlings v. Kentucky,* 448 U.S. 98, 65 L. Ed. 2d 633, 100 S. Ct. 2556 (1980); *Dunaway v. New York,* 442 U.S. 200,

officer, while awaiting the return of another officer with a corrected search warrant, had information that narcotics were in the defendant's residence and were located in a refrigerator. Circumstances occurred which made the officer believe that the narcotics might be disposed of before the other officer returned. He went to the apartment door, knocked, was admitted and advising the occupants of his purpose, secured the premises awaiting the other officer's return.[3] While there, he advised the defendant he knew of the narcotics sale, knew the narcotics were in the refrigerator, and suggested the defendant produce the drugs voluntarily rather than going to the trouble of a search. The defendant ultimately went to the refrigerator, removed the narcotics and placed them on the table before the officer, whereupon the defendant was arrested. The court noted that "This act served more graphically than words to convey the incriminating fact that he knew of the presence and precise location within his home of the contraband substance." *State v. Dennis, supra* at 423. Here the delivery by Collins of a pistol containing six spent casings, from a location that without Collins' help might not have been otherwise discovered, spoke more graphically than any statement Collins might have made regarding his participation in the shooting.

A review of cases which have been decided subsequent to the suppression hearing and the trial is informative.

Since *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), law enforcement officers about to conduct custodial interrogations have been required to give specified warnings and to "follow certain specified procedures during the course of any subsequent interrogation", *Michigan v. Mosley,* 423 U.S. 96, 100,

---

60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979); and *Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975).

[3] *State v. Dennis, supra,* was decided prior to *State v. Bean,* 89 Wn.2d 467, 572 P.2d 1102 (1978); and *State v. Jones,* 22 Wn. App. 447, 591 P.2d 796 (1979).

46 L. Ed. 2d 313, 96 S. Ct. 321, 324 (1975).[4]

The progeny of *Miranda* have interpreted these warnings as prophylactic safeguards which assure the person in custody his Fifth Amendment rights, *Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975); *Michigan v. Payne,* 412 U.S. 47, 53, 36 L. Ed. 2d 736, 93 S. Ct. 1966 (1973), and have evolved into two levels of protection. The first level assures "that the warnings were given before questioning commences, and that the rights thereunder were voluntarily waived." *United States v. Alexander,* 428 A.2d 42, 47 (D.C. 1981). The second level "prescribe[s] standards for situations where a suspect exercised, rather than waived, one of those rights—the right to remain silent or to the presence of counsel." *United States v. Alexander, supra* at 47.

The first level, with which we are not here concerned, places "a heavy burden . . . on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self–incrimination and his right to retained or appointed counsel", but is subject to "high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst,* 304 U. S. 458 [82 L. Ed. 1461, 58 S. Ct. 1019] (1938)". *Miranda v. Arizona, supra* at 475.[5]

---

[4] "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Miranda v. Arizona, supra* at 444–45.

[5] *Fare v. Michael C.,* 442 U.S. 707, 61 L. Ed. 2d 197, 99 S. Ct. 2560 (1979); *North Carolina v. Butler,* 441 U.S. 369, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979); *Brewer v. Williams,* 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232 (1977). In *Fare* the court referred to the standard for waiver of a constitutional right as a "totality

8

The second level arises either when one has exercised his right to remain silent or has asked for an attorney. The issue of the procedure under which resumption of questioning may be held when one has exercised his right to remain silent was decided by *Michigan v. Mosley, supra.* The procedures under which questioning may be resumed when one has exercised his right to counsel was addressed in *Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981). We are not here concerned with the waiver of the right to counsel and resumption of interrogation.[6] The question of resumption of interrogation arose because of the following language in *Miranda v. Arizona, supra* at pages 473-74:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at

of the circumstances approach." *Fare v. Michael C., supra* at 442 U.S. 725, 99 S. Ct. 2572. *See also State v. Jones,* 95 Wn.2d 616, 628 P.2d 472 (1981), and cases cited which use the same phrase. But in *Edwards v. Arizona,* 451 U.S. 477, 483–84, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981) the court stated:

> The issue in *Schneckloth* [*supra*] was under what conditions an individual could be found to have consented to a search and thereby waived his Fourth Amendment rights. The Court declined to impose the "intentional relinquishment or abandonment of a known right or privilege" standard and required only that the consent be voluntary under *the totality of the circumstances.* The Court specifically noted that the right to counsel was a prime example of those rights requiring the special protection of the knowing and intelligent waiver standard, *id.,* at 241, but held that "[t]he considerations that informed the Court's holding in *Miranda* are simply inapplicable in the present case." 412 U.S., at 246, 93 S. Ct., at 2057. *Schneckloth* itself thus emphasized that the voluntariness of a consent or an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries.

(Italics ours.)

[6] In *Edwards v. Arizona, supra* at 451 U.S. 484–85, 101 S. Ct. 1885, the court stated: "[W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police–initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities *until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.*" (Footnote omitted. Italics ours.)

any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

(Footnote omitted.)

In *Michigan v. Mosley, supra* at 103–04, a defendant charged with several robberies indicated his desire to remain silent. He was placed in jail and 2 hours later another police officer, after giving him his *Miranda* warnings, questioned him about an unrelated holdup murder. The court held the threshold question was to determine whether the accused's "right to cut off questioning" was "scrupulously honored." Relying on the following factors, the court determined that his rights had not been violated and the statement was admissible: (1) he had been properly advised of his *Miranda* rights; (2) the police immediately ceased questioning when he indicated he wished it stopped, made no attempt to resume questioning and did not ask him to reconsider; (3) there was a 2–hour break between the first and second interrogation, the latter being performed at a different location by a different officer about another crime; (4) a full and complete set of *Miranda* warnings were given before the second questioning began, including a full and fair opportunity for the defendant to examine his options, and (5) the second questioning did not undercut the defendant's previous decision to remain silent because it involved an unrelated offense. *Michigan v.*

*Mosley, supra* at 104–06. Having decided his request was "scrupulously honored," the court then must determine whether the waiver was itself voluntary as defined in *Johnson v. Zerbst,* 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019 (1968), and *United States v. Alexander, supra* at 49.

■ We recognize the trial court did not apply the Fifth Amendment standards as set forth in *Miranda* and its progeny in determining the admissibility of the gun. However, it is our duty to examine the entire record and make an independent determination of the ultimate issue of voluntariness when a constitutional issue is involved. *Davis v. North Carolina,* 384 U.S. 737, 741–42, 16 L. Ed. 2d 895, 86 S. Ct. 1761 (1966); *State v. Dennis, supra* at 420.

■ We conclude under these facts the police did not comply with the procedure in *Michigan v. Mosley, supra.* In *Rhode Island v. Innis,* 446 U.S. 291, 301–02, 64 L. Ed. 2d 297, 307–08, 100 S. Ct. 1682, 1689–90 (1980), the court defined "interrogation" as referring:

> [N]ot only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. *A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.* But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can *extend only to words or actions* on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

(Footnotes omitted. Some italics ours.) As applied here, we see that upon Collins' exercise of his right to remain silent

after he was carefully advised of his *Miranda* rights, the police did not immediately cease their interrogation or confine their remarks to those normally attendant to arrest and custody. Rather, Detective Thomas, who was well known to the defendant and had played cards with him on numerous occasions, suggested that it would be helpful if they had the gun. This was a statement, under the circumstances, which Detective Thomas should have known was "likely to elicit an incriminating response." Further, the suggestion did undercut the defendant's previous decision to remain silent.[7]

Collins testified at the suppression hearing that he did not feel coerced, nor intimidated by the officer's drawn weapon. However, his past relationship with Detective Thomas and his belief the officers could discover he had a concealed weapons permit caused him to agree to the officers' request. On these facts, we cannot find that Collins' Fifth Amendment rights were "scrupulously honored."

It is unnecessary to consider whether the admissibility of the weapon was harmless error, inasmuch as we reverse on the failure to give an instruction on manslaughter in the second degree.

### The admissibility of a statement.

Judged by the standards referred to above, the trial court found the defendant's friendship with Detective Thomas did not make his statement untrustworthy nor involuntary. The defendant contends that when the statement was made 18 hours after his arrest, he was still too intoxicated to give a knowing and intelligent waiver of his right to remain silent. Intoxication does not automatically prevent a waiver of his *Miranda* rights. *State v. Cuzzetto,* 76 Wn.2d 378, 457 P.2d 204 (1969); *State v. Smith,* 15 Wn.

---

[7]In *State v. Newfield,* 229 Kan. 347, 623 P.2d 1349 (1981), the court, applying *Michigan v. Mosley, supra,* standards, upheld the admissibility of a statement made 5 minutes after the defendant's request for counsel. *Cf. Commonwealth v. Brant,* __ Mass. __, 406 N.E.2d 1021, *cert. denied,* 449 U.S. 1004, 66 L. Ed. 2d 301, 101 S. Ct. 545 (1980).

App. 103, 547 P.2d 299 (1976), *cert. denied,* 429 U.S. 1065, 50 L. Ed. 2d 783, 97 S. Ct. 794 (1977); *State v. Elkins,* 4 Wn. App. 273, 480 P.2d 776 (1971). The trial court found, based on conflicting testimony, the defendant was not intoxicated at the time he gave this statement to Detective Thomas. The court will be upheld if substantial evidence supports its ruling. We find no error.

The defendant also contends that this statement was untimely introduced, *i.e.,* the prosecutor had not completed his evidence showing a prima facie case of homicide. Matters of timing are within the discretion of the trial court and will not be overturned except upon an abuse thereof. *State v. Smith,* 12 Wn. App. 720, 728, 531 P.2d 843 (1975), *cert. denied,* 434 U.S. 876, 54 L. Ed. 2d 155, 98 S. Ct. 226 (1977). We find no abuse of discretion.

> *The court's failure to instruct that an intoxication defense applies to manslaughter in the second degree and failure to give a manslaughter in the second degree instruction.*

The defendant sought and obtained an intoxication instruction, but the instruction stated intoxication was only applicable to murder not first degree manslaughter. No objection was made to the instruction. The defendant sought an instruction on manslaughter in the second degree on the alternative ground that it was a lesser offense to murder in the second degree.

Since there was no objection to the intoxication instruction given, that instruction became the law of the case. *State v. Claborn,* 95 Wn.2d 629, 633, 628 P.2d 467 (1981).

We hold manslaughter in the second degree is an included offense to the greater charge of murder in the second degree under the facts presented in this case. RCW 9A.16.090 states:

No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of

any particular mental state is a necessary element to constitute a particular species or degree of crime, the fact of his intoxication may be taken into consideration in determining such mental state.

The court found there was sufficient evidence to warrant the giving of an intoxication instruction; the defense established the fact of drinking and its effect upon the defendant as it related to his mental processes, specifically his ability to form an intent. *State v. Mriglot,* 88 Wn.2d 573, 564 P.2d 784 (1977); *State v. King,* 24 Wn. App. 495, 501–02, 601 P.2d 982 (1979); *State v. Boyd,* 21 Wn. App. 465, 586 P.2d 878 (1978), *vacated on other grounds,* 93 Wn.2d 148, 607 P.2d 845 (1980).

RCW 9A.08.010(1) defines the kinds of culpability as:

(a) *Intent.* . . .

(b) *Knowledge.* A person knows or acts knowingly or with knowledge when:

(i) he is aware of a fact, facts, or circumstances or result described by a statute defining an offense; or

(ii) he has information which would lead a reasonable man in the same situation to believe that facts exist which facts are described by a statute defining an offense.

(c) *Recklessness.* A person is reckless or acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation.

(d) *Criminal negligence.* A person is criminally negligent or acts with criminal negligence when he fails to be aware of a substantial risk that a wrongful act may occur and his failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable man would exercise in the same situation.

RCW 9A.08.010(2) describes the substitutes for criminal negligence, recklessness and knowledge as follows:

When a statute provides that criminal negligence suffices to establish an element of an offense, such element also is established if a person acts intentionally, knowingly, or recklessly.

The comments to the original draft of this section of the new criminal code, cited in *State v. Jones,* 95 Wn.2d 616,

621, 628 P.2d 472 (1981), note: "'[T]he four mental states are ranked or related in such a way that proof of any one mental state establishes all lower mental states.'" Thus, where an offense requires a mental state of criminal negligence, proof of intent would also establish criminal negligence, a "lesser–included" mental state. Under the facts of *Jones,* the court noted at pages 622–23:

> There were, then, two possible ways the jury could have decided that appellant lacked the intent necessary for a conviction of second degree murder. They could have found either that he was so intoxicated as to be unable to form the intent to kill or, alternatively, that he acted in self–defense, but recklessly or negligently used more force than was necessary to repel the attack.

(Citations omitted.)

■ In *State v. Colwash,* 15 Wn. App. 530, 532, 550 P.2d 57, (1976), *aff'd,* 88 Wn.2d 468, 564 P.2d 781 (1977), this court reversed a murder conviction for failure to give a manslaughter instruction as that crime was defined under the prior criminal code, stating:

> Without the manslaughter instruction, the jury was required to either find the defendant guilty of one of the degrees of murder or acquit him. It is unrealistic to believe that a jury would acquit the defendant under the facts presented. The refusal to give the manslaughter instruction disarmed the defendant of the theory that if he was guilty of any crime it was manslaughter, an unintentional killing, by reason of his intoxicated condition.

Applying statutory language concerning voluntary intoxication (RCW 9A.16.090), "whenever the actual existence of any particular mental state is a necessary element to constitute a particular species or a degree of crime, the fact of his intoxication may be taken into consideration in determining such mental state", to the definitions of culpability (RCW 9A.08.010), we would find that the trial court was correct in instructing that intoxication may affect recklessness, but not negligent conduct.

Recklessness requires knowledge and disregard of a substantial risk, whereas criminal negligence relates only to the

failure to be aware of a substantial risk and that such failure constitutes a gross deviation "from the standard of care that a reasonable man would exercise in the same situation." RCW 9A.08.010(1)(d). We believe public policy requires in the event of intoxication as related to homicide, that it relate only to knowledge or intent as defined statutorily, but not criminal negligence.

We further find it was the intent of the legislature in defining manslaughter in two separate degrees that second degree manslaughter encompass unintentional killings and that intoxication is not applicable thereto.

█ █ However, because of the intoxication evidence, second degree manslaughter is a lesser included offense to murder, under the rationale of *State v. Jones, supra.* As stated in *State v. Workman,* 90 Wn.2d 443, 447–48, 584 P.2d 382 (1978), a defendant is entitled to an instruction on a lesser included offense if two conditions are met.

> First, each of the elements of the lesser offense must be a necessary element of the offense charged. . . . Second, the evidence in the case must support an inference that the lesser crime was committed.

(Citations omitted.) As noted in *State v. Jones, supra* at 621, our present criminal code sets forth several kinds of culpability, namely intent, knowledge, recklessness and criminal negligence. Since mental states are ranked so that the higher includes the lower, intent necessarily includes criminal negligence. Thus, murder would include manslaughter in the first and second degrees; they are not inconsistent mental states. *Cf. People v. Stanfield,* 36 N.Y.2d 467, 330 N.E.2d 75, 369 N.Y.S.2d 118 (1975).

*The failure to give a self–defense instruction.*

█ At trial the defendant was unable to remember any of the incidents in the tavern. However, on the evening following his early morning arrest, he did tell Detective Thomas that he believed the victim made a grab for his money and that he had seen a knife. The victim's personal effects did disclose a small pocketknife. While this evidence

might not be persuasive, it is not for the court to weigh the evidence in a jury case. In self–defense, the conduct of the defendant must be that which a reasonably prudent person would use under the same or similar circumstances as they appear to the slayer at the time. *State v. Jones, supra; State v. Bailey,* 22 Wn. App. 646, 591 P.2d 1212 (1979); *State v. Strand,* 20 Wn. App. 768, 781, 582 P.2d 874 (1978). The court should consider giving the instruction on retrial, depending upon the evidence presented at that time.

The balance of defendant's assignments of error need not be considered. The trial court is reversed and the case remanded for a new trial.

ROE, A.C.J., and GREEN, J., concur.

Reconsideration denied September 29, 1981.

Review denied by Supreme Court December 3, 1981.