# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>MELVIN LEWIS TAYLOR, JR,<br><br>Appellant. | No. 85008-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — Melvin Taylor, Jr. was convicted of murder in the first degree under RCW 9A.32.030(1)(c). On appeal, he argues that the State improperly presented new expert opinion at trial, and on this basis he asserts (1) the trial court erred in overruling his objection to the State's DNA expert's testimony on direct examination, (2) the trial court erroneously denied his CrR 7.5 motion for a new trial based on the State's alleged discovery violation, (3) the DNA expert's testimony amounted to an improper opinion on Taylor's guilt, (4) defense counsel was ineffective in failing to renew his objection to the DNA expert's opinion, and (5) as stated in Taylor's statement of additional grounds, the State failed to disclose exculpatory evidence. Finding no error, we affirm Taylor's conviction.

I

We limit our discussion of the trial evidence to that necessary to Taylor's contention that the State presented a new expert opinion at trial. L.K.'s body was found behind a grocery store off Pacific Highway in Federal Way. Her pants were

unfastened and unzipped, and completely off her right leg. Two used condoms were collected at the scene. A medical examiner collected vaginal and anal swabs and testified that L.K.'s cause of death was asphyxia due to strangulation, classifying the manner of death as homicide.

Michael Dornan, a DNA analyst at the Washington State Patrol Crime Laboratory, examined the two condoms and the vaginal and anal swabs. Dornan labeled the condoms condom "A" and condom "B" and swabbed the condoms to test for semen. Condom A was positive for the presence of P30—an enzyme found in semen—and the anal and vaginal swabs produced positive results for semen. Dornan testified the male profile developed from the condom and the two swabs was a "single source male profile," which Dornan identified as individual "A."

Taylor's DNA profile matched the male profile identified as individual A developed in L.K.'s case. A detective submitted additional items for testing at the crime lab, including L.K.'s underwear. Jennifer Reid, a forensic scientist with the Washington State Patrol Crime Laboratory, reviewed Dornan's work and performed further analysis of the evidence. Reid conducted multiple presumptive tests on L.K.'s underwear to look for seminal fluid, and did not detect any.

The State charged Taylor with first degree murder under RCW 9A.32.030(1)(c) predicated on rape in the first or second degree. The State's theory was that the absence of any seminal fluid from L.K.'s underwear was circumstantial evidence that L.K. never stood up again after Taylor's ejaculate entered her body. At trial, the State asked Reid about her expectation about transfer of seminal fluid to the underwear if L.K. had put them back on, and Reid

2

testified she would have expected in that case to find seminal fluid in her testing. Taylor contends this was a new opinion. The jury convicted Taylor of murder in the first degree. Taylor appeals.

II

During direct examination, Reid testified she did not look for DNA on the underwear because "the request was to see if potentially [L.K.] had put the underpants back on and if any transfer of seminal fluid had happened. And so I was looking for seminal fluid." The following testimony occurred:

Q. Were you aware of whether or not spermatozoa was visible on the vaginal swab that [Dornan] examined?

A. Yes, I was aware and there was.

Q. And in what amount? And I don't mean precise numbers, but a small amount, a medium amount, a lot amount. What was the volume that was seen in her vaginal swab?

A. Well, there was a good amount; there was a moderate amount.

Q. And could that be consistent with ejaculation?

A. Yes.

Q. And based on that amount being on the vaginal swab, did you expect to see—

[DEFENSE COUNSEL]: I'm going to object to this. I don't think there's a basis for this opinion.

. . . .

THE COURT: Restate the question for me, please.

. . . .

Q. Based on—you indicated that you didn't go forward with any DNA testing—based on what you saw in [Dornan's] report of the amount

3

of sperm in the vaginal swab, would you expect to see DNA from sperm on her underwear if she had put them back on?

[DEFENSE COUNSEL]: And I'm objecting.

THE COURT: Overruled.

. . . .

A. Yes. So my expectation when looking for seminal fluid on the underpants is that if [L.K.] had put them back on that I would have hoped to have found some, you know, a little bit of something on those underpants that would've been detectable with that type of testing that we had.

On redirect, Reid testified she was confident she had performed every test to determine there was no seminal fluid in L.K.'s underwear. When asked, "Given what you saw or what you observed in [L.K.'s] vaginal swab and her anal swab, what was your expectation with respect to transfer to that underwear if she had put it back on?" Reid replied,

Yes. Well, that was my expectation. That was my recommendation. Based on the amount of seminal fluid that was found on her body, the expectation would be that all of my tests, I would have gotten some sort of answer from all those tests. So that's why I didn't recommend DNA.

Taylor did not object.

Following trial, Taylor moved for a new trial pursuant to CrR 7.5 "because the state elicited an improper opinion, which had not been previously disclosed to defense *on redirect.*" (Emphasis added.) Taylor contended he was aware that the State would argue its theory that if L.K. had put her underwear back on, seminal fluid would have been found in her underwear, however, he was not prepared to challenge that expert opinion because "it never appeared in any document before." The State argued the testimony was not a complete surprise because prior

4

defense interviews "talked about sort of this drainage issue and discharge issue," and Reid's testimony "just provided context." The trial court held Reid's testimony was not an improper opinion and could not conclude "that the testimony would have been prejudicial in the context of being testimony that then could be, that the testimony itself essentially misled the jury in any way, nor can I say that this issue was in any way a surprise."

A

Taylor argues Reid's opinion was inadmissible under ER 702 because it was speculative and lacked an adequate factual basis. We disagree.

To be admissible under ER 702, expert testimony must be, among other requirements, "helpful to the trier of fact." State v. Lewis, 141 Wn. App. 367, 389, 166 P.3d 786 (2007). Expert testimony is helpful if "it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury." State v. Thomas, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004). The expert's testimony must be relevant, meaning it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401, 402. Speculative testimony, even if from an expert, is irrelevant. Lewis, 141 Wn. App. at 389. Determining the admissibility of expert evidence is largely within a trial court's discretion, and its decision will not be disturbed except for an abuse of such discretion. In re Marriage of Katare, 175 Wn.2d 23, 38, 283 P.3d 546 (2012). "A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." State v. Griffin, 30 Wn. App.

5

2d 164, 170, 544 P.3d 524, <u>review denied</u>, 3 Wn.3d 1015, 554 P.3d 22 (2024). If the basis for admission of the evidence is " 'fairly debatable,' " we will not disturb the trial court's ruling. <u>Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue</u>, 106 Wn.2d 391, 398, 722 P.2d 787 (1986) (internal quotation marks omitted) (quoting <u>Walker v. Bangs</u>, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979)).

Taylor objected to Reid's direct examination testimony, arguing Reid lacked "a basis for this opinion." Reid testified she had 20 years of experience working in the crime lab as a DNA analyst. In her first year, Reid was "learning how to identify the different biological fluids we'd be dealing with, getting that DNA out of those different biological fluids, and what that process was." Reid testified she was familiar with Dornan's testing of the vaginal swab, and there was a "moderate amount" of spermatozoa on the swab, which could be consistent with ejaculation. Reid's experience, coupled with the facts available to her, provided some foundation for the trial court to admit her testimony that if L.K. had put the underwear back on seminal fluid would have been "detectible with that type of testing that we had." Though Reid did not testify about her direct knowledge on the transfer of bodily fluids, Taylor "ably raised these foundational challenges for the jury's consideration during . . . cross-examination." <u>Johnston-Forbes v. Matsunaga</u>, 177 Wn. App. 402, 412, 311 P.3d 1260 (2013), <u>aff'd</u> 181 Wn.2d 346, 333 P.3d 388 (2014). Taylor's challenge " 'goes to the testimony's weight, not its admissibility.' " <u>Johnston-Forbes</u>, 181 Wn.2d at 357 (quoting <u>Katare</u>, 175 Wn.2d at 39). Because the trial court's decision to overrule Taylor's objection was at least

fairly debatable, we cannot say the trial court abused its discretion in determining this testimony had a sufficient foundational basis.

B

Taylor argues the trial court erred in denying his motion for a new trial because the State violated its discovery obligations under CrR 4.7 by eliciting Reid's "previously undisclosed opinion" about semen transfer. We disagree.

A trial court has wide discretion in ruling on discovery violations and motions for a new trial. State v. Linden, 89 Wn. App. 184, 189-90, 947 P.2d 1284 (1997). These decisions will not be disturbed on appeal unless the court abused its discretion. Id. at 190. CrR 4.7(a)(2)(ii) requires a prosecutor to disclose to the defendant "any expert witnesses whom the prosecuting attorney will call at the hearing or trial, the subject of their testimony, and any reports they have submitted to the prosecuting attorney." The purpose of this rule is to prevent a defendant from being prejudiced by surprise, misconduct, or arbitrary action by the government. State v. Cannon, 130 Wn.2d 313, 328, 922 P.2d 1293 (1996).

In State v. Greiff, 141 Wn.2d 910, 916, 10 P.3d 390 (2000), a law enforcement officer testified at the defendant's first trial that when he asked the victim if they had been sexually assaulted, they told him they had not. The court declared a mistrial after the jury could not reach a unanimous verdict. Id. In the second trial, defense counsel, relying on the officer's earlier testimony, stated in their opening that the police officer would testify he asked the victim if they had been assaulted, and they told him they had not. Id. However, when the officer took the stand in the second trial, he testified that he never asked the victim if they

had been sexually assaulted. Id. at 917. The court concluded the State violated its discovery obligation under CrR 4.7(a)(1)(i) because "the record shows that the deputy prosecuting attorney assigned to this case knew as early as the day before the second trial" that the officer's testimony would differ, and the information was discoverable. Id. at 919-20.

In response to the motion for a new trial, the State submitted excerpts of Reid's two pretrial interviews. Analogizing to Greiff, Taylor focuses on defense counsel's question at one of the interviews about the amount of ejaculate: "[A]re you able to say this is, like, a full ejaculation, or this could be a stray sperm from, you know, post-ejaculation or penetration or the condom's used improperly, or what have you; or are you able to say it's a full ejaculation?" Reid answered, "I can't remember what the quantities were for some of that. I mean, I think he had a good quantity of DNA. But whether I could say for certain that it's a full ejaculation versus a partial, I don't think I could say that." She added, "I don't know that you could know that exactly." Taylor characterizes this as a pretrial statement that Reid could say nothing about the amount of ejaculate, and argues that, like the officer in Greiff, she reversed her testimony when she opined she would have expected transfer. But Reid's interview statement denied only the ability to say whether there had been "full" or "partial" ejaculation, a question appearing to relate to absolute quantity, and Reid reiterated her opinion that there was qualitatively "a good quantity of DNA." Reid did not reverse a statement she had previously made as the officer did in Greiff.

During the pretrial interviews, Reid stated she was looking for seminal fluid on the underwear and did not conduct DNA testing on the underwear as she would not have been able to put any relevance to the DNA profile "because we don't know what type of the DNA is even originating from it." Reid stated there was a possibility of vaginal discharge if a person was horizontal but "it would be at a much lesser amount," and if a person was "getting up, moving around, then you're already draining seminal fluid out of yourself" because "gravity is working on you." Reid's interview statements indicate there was a level of spermatozoa sufficient for a DNA profile in the vaginal area, she was concerned about drainage and concerned to test the underwear for seminal fluid, finding none, and this eliminated need for further DNA testing. In compliance with CrR 4.7(a)(2)(ii), the State disclosed Reid, the subject of her testimony, and made her available for pretrial interviews. The trial court did not abuse its discretion in determining the State did not violate its discovery obligation and denying Taylor's motion for a new trial.

C

Taylor argues Reid's testimony was constitutionally improper because it amounted to a comment on Taylor's guilt. We disagree.

In a criminal trial, "[o]pinions on guilt are improper whether made directly or by inference." State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014). "Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." Id. The trial court has wide discretion to determine the admissibility of evidence, and

9

the trial court's decision whether to admit or exclude evidence will not be reversed on appeal unless the appellant can establish that the trial court abused its discretion. State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001).

An opinion is not improper merely because it involves an ultimate factual issue. City of Seattle v. Heatley, 70 Wn. App. 573, 578, 854 P.2d 658 (1993). ER 704 states, "Testimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." But the opinion must be "otherwise admissible." Heatley, 70 Wn. App. at 579. Therefore, where opinion testimony on an ultimate issue lacks proper foundation, is not helpful to the trier of fact, is confusing or misleading, or its probative value is substantially outweighed by the danger of unfair prejudice, the testimony may constitute an impermissible opinion on guilt. Id.

Whether testimony constitutes an impermissible opinion on guilt or a permissible opinion embracing an ultimate issue will depend on the "specific circumstances of each case, including the type of witness involved, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of fact." Id. In Quaale, an answer by a state trooper in a DUI case that " 'Absolutely. There was no doubt [the defendant] was impaired' " was an improper opinion on guilt because it "went to the core issue and the only disputed element." 182 Wn.2d at 200. Similarly, in State v. Montgomery, a police officer testified, " 'I felt very strongly that they were, in fact, buying ingredients to manufacture methamphetamine based on what they had purchased, the manner in which they had done it, going from different stores, going to different

10

checkout lanes." 163 Wn.2d 577, 587-88, 183 P.3d 267 (2008). This, among other statements, was an improper opinion on guilt because it "went to the core issue and the only disputed element." Id. at 594.

"Improper opinions on guilt usually involve an assertion pertaining directly to the defendant." Heatley, 70 Wn. App. at 577. In contrast, "testimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony." Id. at 578. We have "expressly declined to take an expansive view of claims that testimony constitutes an opinion on guilt." Id. at 579. In Demery, the court concluded statements by police officers in a recorded interrogation of the defendant suggesting the defendant was lying did not amount to opinion testimony concerning truthfulness. 144 Wn.2d at 764-65. In Heatley, testimony by a police officer that a driving while under the influence of intoxicating liquor defendant was " 'obviously intoxicated' " and " 'could not drive a motor vehicle in a safe manner' " were not improper opinions on guilt because they were not "direct" statements on the defendant's guilt and were based on the officer's experience and observations of the defendant's appearance and performance on field sobriety tests. 70 Wn. App. at 577, 579. The officer's statements based on observation were "similar to but not identical to" the controlling legal standards in the jury instructions, and amounted to an opinion on "the degree of intoxication" the defendant exhibited. Id. at 581-82. This was distinguished from an opinion on guilt. Id. at 582.

The statement Taylor describes as an improper opinion on guilt came in the context of the State asking why Reid did not conduct DNA testing on L.K.'s underwear. Reid testified, "So my expectation when looking for seminal fluid on the underpants is that if [L.K.] had put them back on that I would hoped to have found . . . a little bit of something on those underpants that would've been detectable with the type of testing that we had." Reid's statements do not go directly to Taylor's guilt, but only to Reid's expectation for seminal fluid transfer, and the statements were couched in terms of the limits of Reid's testing. The State's closing acknowledged that the absence of transfer was circumstantial evidence that L.K. never got up again, a fact that inferentially suggested Taylor's guilt. Reid's statements did not amount to an improper opinion on guilt.[1]

D

Taylor argues defense counsel was ineffective in failing to renew his objection to Reid's "undisclosed, improper opinion." We disagree.

To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that (1) counsel's representation was deficient, meaning it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) the defendant was prejudiced, meaning there is a reasonable probability that the result of the proceeding would have been different but for the challenged conduct. Strickland v. Washington, 466 U.S. 668, 687, 104

---

[1] Taylor argues the trial court erred in ruling that defense counsel "made Reid's opinion relevant and admissible," contending the trial court's ruling was "essentially one of curative admissibility." Because we hold the trial court did not abuse its discretion in overruling Taylor's objection, or denying Taylor's motion for a new trial, we need not reach this issue.

S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If either prong has not been met, we need not address the other. State v. Garcia, 57 Wn. App. 927, 932, 791 P.2d 244 (1990).

"When a defendant bases his ineffective assistance of counsel claim on trial counsel's failure to object, the defendant must show that the objection would likely have succeeded." State v. Crow, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019). Reid's testimony was not a new opinion that violated CrR 4.7, nor did it lack a foundational basis. Taylor cannot show that an objection to Reid's cross-examination or redirect testimony would have succeeded. Therefore, Taylor cannot show deficient performance and his claim for ineffective assistance of counsel fails.

III

In his statement of additional grounds, Taylor argues the State knowingly used perjured testimony where "Reid [gave] testimony to a DNA test, which on cross-examination Reid acknowledged she did not conduct any DNA testing of L.K.'s underwear," and argues defense counsel was ineffective by failing to have an ongoing objection during Reid's testimony. Because these issues are addressed above, we do not separately consider Taylor's similar pro se argument. State v. Johnson, 100 Wn. App. 126, 132, 996 P.2d 629 (2000).

Taylor further provides multiple case citations regarding the State's duty to disclose exculpatory material and what a defendant must demonstrate to establish a violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). However, Taylor provides no argument or factual basis that the State failed

13

to disclose exculpatory evidence in this case.  This claim fails to inform the court of the "nature and occurrence of [the] alleged errors."  RAP 10.10(c).  Therefore, we decline to address this claim.

Affirmed.

Birk, J.

WE CONCUR:

Díaz, J.

Smith, C.J.