2015 DEC 21 AM 11:04
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72468-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| CHRISTOPHER MICHAEL ERVIN, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 21, 2015 |
| | ) | |

APPELWICK, J. — Ervin appeals his conviction for assault in the third degree and malicious mischief in the first degree. He contends that the trial court erred when it denied his request for a voluntary intoxication instruction, because there was substantial evidence of intoxication in the record to warrant the instruction. He asserts that if there was insufficient evidence of intoxication in the record to warrant the instruction, he received ineffective assistance of counsel. We affirm.

## FACTS

On April 9, 2014, Fariborz Tavakkolian was driving home on Vashon Island. He called 911 after he observed Christopher Ervin in the middle of the road, weaving in and out of traffic with a beer can in his hand. Tavakkolian observed that Ervin was acting erratically and "might have had too much to drink." Ervin was

yelling at cars and yelling in different directions. Tavakkolian could not hear what Ervin was saying.

Deputy Jeff Hancock received a 911 dispatch call around 9:15 that night indicating that someone was jumping in and out of traffic. Deputy Hancock arrived at the scene and observed Ervin and another man, Andy Fuller, on the side of the street. Ervin was "flailing about" and his arms were up. Ervin was yelling profanities at passing vehicles. At one point, Ervin picked up a beer can, went into the middle of the road, and put the can over his head as though he was going to throw it. Seconds later, when Ervin was out of view, Deputy Hancock heard the can hit the ground. Ervin then continued to walk down the middle of the road with his hands up in the air yelling "F you, F you." Deputy Hancock then observed Ervin hide in the alcove of a store. As a vehicle approached, Ervin darted out into the crosswalk at the last second causing the car to slam on its brakes, slow, and swerve. Ervin yelled profanities at the car as it slowly passed him.

At that point, Deputy Hancock radioed his partner, Deputy Joel Anderson, to let him know that he had probable cause to arrest Ervin for disorderly conduct. Deputy Anderson informed Deputy Hancock that he had just seen Ervin walking toward the back entrance of a bar. Deputy Hancock and Deputy Anderson met up and approached the back entrance of the bar. The deputies saw Ervin near the back entrance of the bar and called out to him. Ervin did not stop but instead entered the bar. Deputy Hancock remained by the back entrance while Deputy Anderson drove around to the front entrance. Shortly thereafter, Deputy Anderson observed Ervin exit from the front entrance. Deputy Anderson ordered Ervin to

show his hands and put them on the hood of his car. Ervin was agitated and did not comply with those instructions, but sat on the pavement in front of Deputy Anderson's car.

Deputy Hancock arrived and handcuffed Ervin. The deputies placed Ervin in the back of Deputy Anderson's patrol car. Deputy Anderson drove Ervin back toward Deputy Hancock's patrol car. As the officers convened in front of their cars, they heard a loud noise and saw Ervin kick out the back patrol car window after three or four tries.

The deputies had Ervin step out of the car. Ervin was very upset, loud, and angry. He was yelling and screaming nonstop at the top of his lungs. He was yelling, "Fuck you" over and over again. He was speaking some gibberish throughout. Ervin directed several comments toward Deputy Hancock specifically. Ervin told Deputy Hancock that he was going to pay for his crimes. Ervin also said that he had the right to spit in Deputy Hancock's face, that his kids and grandkids would wake up in hell, and that he was a corrupt and crooked cop.

After Ervin announced that he had the right to spit in Deputy Hancock's face and began to clear his lungs as if to do so, the deputies tried to put a spit mask over his head. As they did, Ervin broke free from the deputies' holds and lowered his shoulder and head straight into Deputy Hancock. Deputy Anderson held onto Ervin's right arm to keep him from pushing into Deputy Hancock, but Ervin's force was so strong that he drove all three of them into a fence.

At that point, the deputies made Ervin lie prone on the hood of the patrol car. Ervin wrapped his leg around Hancock's leg and "clamped down . . . like a

3

python." Deputy Hancock was in pain and was totally immobile as a result. Deputy Hancock finally freed himself by lowering his weight and sitting down. Ervin continued to yell profanities and was saying things about religion and corrupt police officers.

The deputies sat Ervin on the curb. Ervin said that he would not resist anymore. But, he continued yelling and began to stand up again. As Deputy Hancock attempted to control him, Ervin kicked him in the knee. Deputy Hancock stumbled and buckled from the pain. The deputies wrestled Ervin to the ground and held him until Deputy Melvin Dickson arrived.

Ervin was still screaming and yelling when Deputy Dickson arrived. Deputy Dickson could not tell what Ervin was yelling. Deputy Dickson took Ervin to his patrol car and placed him inside. Ervin's demeanor changed when he was with Deputy Dickson. He was calm, relaxed, and compliant with Deputy Dickson's requests.

The State charged Ervin with assault in the third degree pursuant to RCW 9A.36.031(1)(g) and malicious mischief in the first degree pursuant to RCW 9A.48.070(1)(b). Before Ervin's trial, the court held a CrR 3.5 hearing to consider the admissibility of Ervin's statements that he made during the arrest. Ervin testified at the CrR 3.5 hearing. He testified that he had whiskey and two to three beers on the night of the incident. He further testified that he smoked methamphetamine and marijuana that day. The trial court admitted Ervin's statements.

At trial, Tavakkolian, Deputy Hancock, Deputy Anderson, Deputy Dickson, and a bystander at the bar, Adalaar Deruyter, testified about the incident. After the State rested at trial, defense counsel requested a voluntary intoxication instruction based on Washington Pattern Jury Instruction: Criminal 18.10, at 282 (3d Ed. 2008) (WPIC). The defense's proposed instruction stated,

> No act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition. However, evidence of intoxication may be considered in determining whether the defendant acted intentionally.

Ervin argued that there was a sufficient factual basis for the instruction based on Tavakkolian's 911 call during which he indicated that Ervin might be drunk, Ervin's generally erratic behavior, and Ervin's yelling. The trial court denied Ervin's request for the jury instruction. It reasoned that there was no evidence that Ervin was intoxicated such as testimony that Ervin smelled of alcohol, had bloodshot eyes, or any other physical symptoms. The trial court concluded that the jury would be required to speculate, because Tavakkolian was not close enough to Ervin to be sure he was intoxicated. And, it concluded that Ervin's bizarre behavior was insufficient.

After the court denied the instruction, the defense rested without calling any witnesses. Ervin did not testify. During closing argument, defense counsel asked the jury to consider whether the State met its burden of proof as to whether Ervin acted intentionally. Defense counsel stated that Ervin was in "an altered state." And, she urged the jury to consider the circumstances under which Ervin acted.

5

The jury found Ervin guilty of both assault in the third degree and malicious mischief in the first degree. Ervin appeals.

DISCUSSION

Ervin argues that the trial court erred in refusing to give him the requested voluntary intoxication instruction. He contends that the trial record contained substantial evidence of his intoxication and the intoxication's impact on his state of mind. Alternatively, Ervin asserts if the court concludes there is insufficient evidence in the record to support the voluntary intoxication instruction, his counsel was deficient in failing to elicit enough evidence at trial. Consequently, he claims that he received ineffective assistance of counsel.

I.   Voluntary Intoxication Instruction

Ervin first argues that the trial court erred in refusing to provide the voluntary intoxication jury instruction. He claims that without the instruction, he was unable to effectively argue his intoxication defense, which rendered the verdict unreliable.

By statute, Washington recognizes an intoxication defense. RCW 9A.16.090. The statute provides that whenever a crime has a "particular mental state," voluntary intoxication "may be taken into consideration in determining such mental state." Id.

A criminal defendant has a right to have the jury instructed on a defense that is supported by substantial evidence. State v. Walters, 162 Wn. App. 74, 82, 255 P.3d 835 (2011). In evaluating whether the evidence is substantial enough to support a defendant's proposed instruction, the trial court must interpret it most strongly in the defendant's favor. State v. Douglas, 128 Wn. App. 555, 561-62,

116 P.3d 1012 (2005). A trial court's refusal to give a jury instruction based on a factual dispute will be reviewed for abuse of discretion. State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998).

A criminal defendant is entitled to a voluntary intoxication jury instruction only if: (1) the crime charged has as an element a particular mental state, (2) there is substantial evidence of drinking and/or drug use, and (3) the defendant presents evidence that the drinking or drug use affected the defendant's ability to acquire the required mental state. State v. Everybodytalksabout, 145 Wn.2d 456, 479, 39 P.3d 294 (2002); State v. Webb, 162 Wn. App. 195, 209, 252 P.3d 424 (2011). Substantial evidence is evidence sufficient to persuade a fair minded person of the truth of the declared premise. State v. Vasquez, 95 Wn. App. 12, 17, 972 P.2d 109 (1998).

The first factor necessary to warrant a voluntary intoxication defense is that a particular mental state must be an element of the crime charged. Everybodytalksabout, 145 Wn.2d at 479. Here, Ervin argues that factor is satisfied as to both the assault in the third degree and the malicious mischief in the first degree charges. The State concedes that the mental state factor is satisfied as to the assault charge under RCW 9A.36.031(1)(g), but not as to the malicious mischief charge under RCW 9A.48.070(1)(b). The State does not contend that first degree malicious mischief does not have a mental state as one of its elements. Rather, the State claims that Ervin failed to preserve any error regarding the malicious mischief charge for appeal, because Ervin requested the jury instruction

below regarding "only the mental state of intent." The State argues that "intent" applies to only the assault charge, not the malicious mischief charge.

First degree malicious mischief requires "knowingly and maliciously" damaging an emergency vehicle. RCW 9A.48.070(1)(b) (emphasis added). Therefore, both knowledge and malice are elements of the crime charged. "Malice" or "maliciously" means an evil intent, wish, or design to vex, annoy, or injure another person. 11 WPIC 2.13, at 59. And, all degrees of the crime of malicious mischief require intent. See State v. Jury, 19 Wn. App. 256, 267, 576 P.2d 1302 (1978). Thus, a voluntary intoxication instruction regarding the mental state of intent applies to a malicious mischief charge. Ervin successfully preserved any error for appeal. And, because the malicious mischief charge clearly requires a particular mental state, we conclude the first factor necessary to warrant the instruction is satisfied.

The second factor is that there must be substantial evidence of intoxication. Everybodytalksabout, 145 Wn.2d at 479. It is not error to refuse to submit the defense of intoxication to the jury where it is supported merely by scintilla evidence as distinguished from substantial evidence. State v. Mriglot, 88 Wn.2d 573, 578, 564 P.2d 784 (1977). There is no need for an expert to testify regarding the effects of intoxication. State v. Kruger, 116 Wn. App. 685, 692-93, 67 P.3d 1147 (2003). But, evidence of intoxication based merely on opinion, unsupported by facts on which to base it, is speculative and conjecture. Mriglot, 88 Wn.2d at 578. Evidence based upon speculation and conjecture does not amount to substantial evidence. See Mriglot, 88 Wn.2d at 578.

Ervin argues that the second factor is also satisfied. He claims that it was obvious to onlookers and obvious to the jury that Ervin was intoxicated. Ervin cites to several pieces of evidence to support his argument that the second factor is satisfied.

First, he cites to Tavakkolian's testimony that he saw Ervin with a beer can in his hand, that he "guessed" Ervin might have had too much to drink, and that Ervin was "drunk walking" in traffic. Ervin next cites to the fact that Tavakkolian believed Ervin to be intoxicated based on his erratic behavior. And, that a reasonable inference from that evidence is that Ervin had consumed the beer in the can he was holding.

But, while testifying, Tavakkolian stated only that he saw Ervin with a can in his hand—not a <u>beer</u> can.[1] And, Tavakkolian actually testified that he thought Ervin's behavior was either erratic <u>or</u> that Ervin was drunk—not that Tavakkolian had deduced Ervin was drunk from his erratic behavior. Tavakkolian did not testify that he saw Ervin drink from the can Ervin was holding. Any evidence that Ervin drank from the can he was holding would be based upon speculation. Evidence based upon speculation and conjecture does not amount to substantial evidence. See <u>Mriglot</u>, 88 Wn.2d at 578.

---

[1] Tavakkolian did refer to the can as a <u>beer</u> can during his 911 call, but the 911 call was not played for the jury during trial. Portions of exhibit 4 were played at trial. Exhibit 4 included a recording of the officers' radio transmissions when they arrived at the scene of the incident. It was only these portions of exhibit 4 that were played for the jury. In fact, the 911 call portion of exhibit 4 was not admitted into evidence. But, both counsel for the State and counsel for Ervin referred to the can as a beer can in their opening statements for the jury.

Second, Ervin cites to his behavior as evidence of his intoxication. Specifically Ervin cites to Deputy Hancock's testimony about him hiding in doorways and darting out to make cars swerve as evidence of bizarre behavior indicative of intoxication. Ervin cites to Deputy Hancock's and Deputy Anderson's testimony about his erratic and belligerent behavior once they attempted to arrest him—screaming, threatening Deputy Hancock, and making bizarre statements. And, he cites to the recording from Deputy Anderson's police radio in which Ervin is heard screaming in the background.[2]

But, Ervin does not cite to any case law in Washington indicating that a defendant merely exhibiting behaviors presumably consistent with intoxication is sufficient evidence to satisfy the second factor. While Washington courts have considered the opinions and observations of others and the defendant's behavior in concluding there is substantial evidence warranting the instruction under the second factor, the courts have not found that evidence sufficient by itself; courts have required more. See, e.g., State v. Jones, 95 Wn.2d 616, 622-23, 628 P.2d 472 (1981); State v. Hackett, 64 Wn. App. 780, 781-83, 785 n.2, 827 P.2d 1013 (1992); State v. Gabryschak, 83 Wn. App. 249, 253, 921 P.2d 549 (1996); Walters, 162 Wn. App. at 78, 82-83.

Specifically, courts have found the instruction warranted, and thus the second factor satisfied, in cases when either an eyewitness or the defendant testifies to the defendant's consumption of the substance itself, when there is

---

[2] Ervin is yelling in the background of the recording, but it is very difficult to hear.

physical evidence of intoxicants in the defendant's body, or when the defendant smelled of alcohol. See, e.g., Jones, 95 Wn.2d at 622-23 (defendant testified that he had 9 or 11 beers, a witness believed that defendant had possibly been drinking, another witness noted the defendant's bloodshot and glassy eyes and slurred speech); Hackett, 64 Wn. App. at 781-83 (doctor testified that defendant confessed he had ingested considerable amounts of cocaine and taken valium, doctors testified that defendant's seizure was likely the result of cocaine ingestion, and a toxicology report showed cocaine and valium metabolites in the defendant's blood); Gabryschak, 83 Wn. App. at 253-54 (finding ample evidence that the defendant was intoxicated based on the fact that the defendant had alcohol on his breath, that he appeared intoxicated, and that he was considered too drunk to drive); Walters, 162 Wn. App. at 78, 82-83 (testimony that defendant consumed at least seven beers and two shots of alcohol and three witnesses described defendant as intoxicated).

Here, while Ervin testified during the CrR 3.5 hearing that he had consumed beer, whiskey, meth, and marijuana that day, the only person who testified about Ervin's intoxication during trial was Tavakkolian. And, Tavakkolian's "guess" that Ervin was intoxicated was based on only the fact that Ervin was holding a can and behaving strangely. No witness testified to seeing Ervin consume any beer or drugs. Ervin was not asked to provide a blood sample. Tavakkolian was not close enough to Ervin to smell his breath or observe any physical symptoms. And, those witnesses who were close enough to do so—the deputies who were engaged in a physical struggle with Ervin—did not indicate that Ervin smelled of alcohol or any

other illicit substance. Therefore, this evidence is speculative. It is not substantial evidence of drinking and/or drug use. We conclude that the second factor is not satisfied.[3] See Mriglot, 88 Wn.2d at 578.

Even assuming there was substantial evidence of drinking or drug use, there is insufficient evidence in the record that the drinking or drug use affected Ervin's ability to acquire the required mental state—the third factor. Everybodytalksabout, 145 Wn. 2d. at 479. To satisfy this factor, there must be substantial evidence of the effects of the alcohol/drugs on the defendant's mind or body. Gabryschak, 83 Wn. App. at 253. The evidence must reasonably and logically connect a defendant's intoxication with his inability to form the requisite mental state. State v. Finley, 97 Wn. App. 129, 135, 982 P.2d 681 (1999). In other words, here, the crucial question is whether the intoxication affected Ervin's ability to act intentionally. Walters, 162 Wn. App. at 83.

Ervin relies on Walters. He does so, because the Walters court concluded that physical manifestations of intoxication provide sufficient evidence from which to infer that a defendant's mental processing was also affected. 162 Wn. App. at 83. This proposition is necessary for Ervin's argument, because he relies solely on physical manifestations of his alleged intoxication—namely his strange and

---

[3] Ervin argues that the trial court erred when it considered only Ervin's intoxication from alcohol and not intoxication from other drugs. Specifically, Ervin cites to the fact that a juror approached defense counsel after trial and asked counsel if she could reach out to Ervin, because her brother died from a meth overdose. The juror wanted to write a letter to Ervin, because she recognized that meth usage was an issue for him too. Ervin now argues that this is evidence that his meth usage was clear to the jury. But, this letter is not in the record. Moreover, even if it were, whether one juror can detect a defendant's struggles with substance abuse is not the standard for whether the instruction is warranted.

belligerent behavior—to argue that the third factor is satisfied. In Walters, the court concluded that the third factor was satisfied based on the following physical evidence: a sergeant described the defendant as having slurred speech, droopy and bloodshot eyes, and that he was swaying back and forth; the defendant did not respond to pain compliance techniques and the sergeant had to use a stun gun on him twice before he could restrain him. Id. at 83.

The trial court also concluded the third factor was satisfied in Kruger. 116 Wn. App. at 692. In Kruger, there was evidence of the defendant's level of intoxication on both his mind and body: his "blackout," vomiting at the station, slurred speech, and imperviousness to pepper spray. Id.

By contrast, the court in Gabryschak, concluded that there was no evidence in the record from which a rational trier of fact could reasonably and logically infer that the defendant was too intoxicated to be able to form the required level of culpability to commit the crimes with which he was charged. 83 Wn. App. at 254-55. Like the case here, in Gabryschak, the defendant was hostile and yelling threats and profanities. Id. at 251-52. But, the Gabryschak court noted that the defendant responded to the officers' requests, indicating that he fully understood the nature of the requests; the defendant tried to break and run while being escorted to the police car, indicating that he was well aware that he was under arrest; and the defendant leaned up against the back of an officer's seat and spoke with conviction while threatening to kill her. Id. The court reasoned that there was no testimony reflecting the fact that the defendant's speech was slurred, that he stumbled or appeared confused, that he was disoriented as to time and place, that

he was unable to feel the pain of pepper spray, or that he otherwise exhibited sufficient effects of the alcohol from which a rational juror could conclude that his intoxication affected his ability to think and act with the requisite mental states. Id. at 255. In rejecting the instruction, the court stated that, at best, the evidence showed that the defendant can become angry, physically violent, and threatening when he is intoxicated. Id. at 254.

Here, the evidence of Ervin's strange and belligerent behavior does not rise to the level of physical manifestations of intoxication present in Walters or Kruger. There is no evidence in the record that Ervin's eyes were bloodshot, that he was vomiting, that he could not walk straight, or that he blacked out.[4] Ervin relies on the fact that there was testimony he was "staggering" in traffic. But, that is a mischaracterization of the evidence. Tavakkolian described Ervin as weaving through traffic—a word that connotes intent.

---

[4] Notwithstanding the lack of these physical manifestations of intoxication, Ervin cites to the fact that he did not indicate that he felt pain despite being handcuffed and wrestled to the ground as evidence that the intoxication affected him. As a preliminary matter, absence of a statement that Ervin was in pain is not as probative as an affirmative statement that he did not feel the pain. Further, Ervin argues this evidence is like the physical evidence in Walters that the defendant did not respond to pain compliance or succumb after a stun gun was used on him the first time. 162 Wn. App. at 83. But, the amount of pain from a stun gun is not akin to the pain of being handcuffed and the pain of struggling with two police deputies. Nor is it akin to the amount of pain deemed to be a sufficient signal of the effects of intoxication in other cases. See Kruger, 116 Wn. App. at 692 (pain of being sprayed with pepper spray); State v. Rice, 102 Wn.2d 120, 122-23, 683 P.2d 199 (1984) (pain of being hit by a car).

In fact, the evidence in the record indicates that Ervin was acting in a calculated and deliberate manner. Deputy Hancock testified that Ervin was hiding and timing his jumps into traffic to surprise oncoming cars. Ervin appeared to avoid the deputies by not stopping when the deputies called out to him initially at the bar—indicating an understanding that he had done something wrong. Once the officers tried to restrain him, Ervin was physically agile enough to immobilize Deputy Hancock in a leg hold and to kick out a window. At one point, Ervin indicated that he was done fighting the officers, took a slight break, and then resumed his struggle. This indicates that Ervin made deliberate choices to keep resisting and that he had the ability to control himself.

Although Deputy Anderson testified that Ervin spoke some gibberish throughout Ervin's tirade, most witnesses understood what Ervin was saying and quoted Ervin's statements rather than classifying them as unintelligible. Most of Ervin's angry statements had to do with displeasure with the police—a relevant topic for someone angry and currently under arrest. Ervin made specific threats to Deputy Hancock's family and made comments referencing corrupt officers and false claims of being beaten. And, Ervin announced that he intended to spit on Deputy Hancock's face before he began clearing his throat to do so. This evidence all suggests that Ervin was acting intentionally.

On the whole, the evidence available here is more like the evidence in Gabryschak upon which the court concluded the third factor was not satisfied. Although Ervin was hostile and yelling, like in Gabryschak, there is no evidence

15

that Ervin's speech was slurred,[5] that he stumbled or appeared confused, that he was disoriented as to time or place, or that he otherwise exhibited sufficient effects of the alcohol for a rational juror to conclude that his intoxication affected his ability to think and act with the requisite mental states for assault and malicious mischief. That his hostile behavior might have been consistent with intoxication is insufficient as evidence of his inability to form intent.

Because Ervin was unable to satisfy the three factors necessary to obtain the voluntary intoxication jury instruction, we conclude that the trial court did not abuse its discretion when it denied the instruction.

## II.   Ineffective Assistance of Counsel

Alternatively, Ervin argues that, if we conclude that there is insufficient evidence of his intoxication to warrant the jury instruction, his counsel was ineffective in failing to elicit enough evidence or call witnesses to establish his intoxication. At trial, Ervin elected not to testify. And, none of the witnesses testified to whether Ervin actually ingested drugs or alcohol or testified regarding the physical manifestations of Ervin's intoxication—evidence needed to warrant the instruction.

Ervin argues that his attorney made two main errors at trial in developing evidence of his intoxication: failing to cross-examine Deputy Hancock or call him as a defense witness and failing to call Fuller or another of Ervin's friends to testify.

---

[5] Ervin claims that there is evidence that his speech was slurred, but that evidence is not in the record.

16

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance was deficient and (2) the deficient performance prejudiced the trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The first prong of the Strickland test requires a showing that counsel's representation fell below an objective standard of reasonableness based on consideration of all the circumstances. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The second prong requires the defendant to show there is a reasonable probability that, but for counsel's errors, the results of the proceeding would have been different. Id. There is a strong presumption of effective assistance. In re Det. of Moore, 167 Wn.2d 113, 122, 216 P.3d 1015 (2009). If defense counsel's trial conduct can be characterized as legitimate trial strategy or tactics, then it cannot serve as a basis for a claim that the defendant did not receive effective assistance of counsel. State v. Lord, 117 Wn.2d 829, 883, 822 P.2d 177 (1991).

A. Testimony of Deputy Hancock

First, Ervin argues that his attorney was deficient by failing to adequately cross-examine Deputy Hancock or call him as a defense witness. At the CrR 3.5 hearing, Deputy Hancock testified that Ervin and Fuller, "both appeared to be really intoxicated." Despite having Deputy Hancock's testimony that he thought Ervin was intoxicated, Ervin's counsel did not cross-examine him about it at trial or call him as a defense witness.

The extent of cross-examination is a matter of judgment and strategy. In re Pers. Restraint of Davis, 152 Wn.2d 647, 720, 101 P.3d 1 (2004). Thus, electing not to cross-examine Deputy Hancock about Ervin's intoxication can be characterized as a legitimate trial tactic. And, the decision about whether to call a particular witness is a matter of legitimate trial strategy. Id. at 742.

Even assuming defense counsel was deficient in not cross-examining Deputy Hancock about Ervin's intoxication, Ervin cannot establish with reasonable probability that, but for these errors, the outcome of his trial would have been different.

Deputy Hancock made one statement about Ervin's intoxication in the CrR 3.5 hearing in response to a question about what Ervin and Fuller were doing when he first arrived on the scene and when he was first observing them. Deputy Hancock's perception that Ervin was intoxicated was based on his witnessing Ervin's behavior from afar. Nothing from Deputy Hancock's written report or his CrR 3.5 testimony indicated that Deputy Hancock observed Ervin with bloodshot eyes, smelling of alcohol, slurring his words, or other specific physical manifestations of intoxication needed to warrant the instruction. And, nothing in Deputy Hancock's CrR 3.5 testimony or written report indicated that he witnessed Ervin ingest any drugs or alcohol. Speculation that Deputy Hancock might have offered additional testimony relevant to the defense is insufficient to show that his testimony would have been sufficient to change the outcome of the proceeding. See Jury, 19 Wn. App. at 265 (declining to rule that actual prejudice was shown because defense counsel neglected to interview and subpoena witnesses who

18

might have helped the defense, because it was only speculative that the witnesses would have been helpful).

We conclude that counsel was not ineffective when she did not cross-examine Deputy Hancock or re-call Deputy Hancock to testify about his opinions of Ervin's intoxication without knowing that his testimony would support Ervin's claim of intoxication.

B. Failure to Call Fuller

Next, Ervin argues that his attorney's performance was deficient by failing to call Fuller or another of Ervin's friends to testify. At the CrR 3.5 hearing, Ervin testified that he had been drinking on the night of the incident. Specifically, he testified that he had consumed three beers and some whiskey. And, he testified that he had smoked both meth and marijuana earlier that day. Ervin argues that his attorney should have called either Fuller or another of Ervin's friends to testify to Ervin's extensive alcohol and drug use that day.

The decision about whether to call a particular witness is a matter of legitimate trial strategy. Davis, 152 Wn.2d at 742. Generally, the decision to call a witness will not support a claim of ineffective assistance of counsel. Thomas, 109 Wn.2d at 230.

Here, defense counsel considered whether to call Fuller as a witness. But, counsel ultimately did not do so. It is unclear from the record why counsel declined to call Fuller as a witness. But, Deputy Hancock testified at the CrR 3.5 hearing that Fuller was with Ervin on the night of the incident in the street and Fuller appeared "really intoxicated." As such, defense counsel might have had doubts

about Fuller's memory and credibility and how he—an associate of Ervin—would appear to a jury. Thus, it was reasonable for Ervin's counsel not to call him.

Even assuming counsel's failure to call Fuller at trial was deficient, there is no evidence that Fuller's testimony—had he agreed to testify to matters that might have self-incriminated him—would have established Ervin's intoxication and changed the outcome of the trial. Fuller did not testify at the CrR 3.5 hearing. There is no evidence in the record indicating that Fuller was actually with Ervin when he drank or took the drugs. At the CrR 3.5 hearing, Ervin testified to doing graffiti with Fuller in the woods. And, Deputy Hancock testified that he saw Fuller and Ervin together in the middle of the street appearing really intoxicated. While Ervin testified that he had been drinking in the woods and while he testified that "we had kind of a party" that day, he never specifically testified that Fuller was with him. Therefore, it is purely speculative that Fuller's testimony would have been helpful in establishing Ervin's intoxication. It is similarly speculative that any of Ervin's other friends could testify as to Ervin's drug and alcohol use that day. Speculation that Fuller or another of Ervin's friends might have offered testimony relevant to the defense is insufficient to show that their testimony would have been sufficient to change the outcome of the proceeding. See Jury, 19 Wn. App. at 265 (declining to rule that actual prejudice was shown because defense counsel neglected to interview and subpoena witnesses who might have helped the defense, because it was only speculative that the witnesses would have been helpful).

Thus, we conclude that failure to call Fuller or one of Ervin's friends as a witness did not constitute ineffective assistance of counsel.

We affirm.

WE CONCUR: