IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint Petition of | ) ) ) | No. 77541-3-I |
| IRA DAVID DECHANT, | ) ) ) | UNPUBLISHED OPINION |
| Petitioner. | ) ) ) | FILED: October 14, 2019 |

SCHINDLER, J. — Ira David Dechant filed a personal restraint petition (PRP) seeking either reversal of the jury convictions of solicitation, conspiracy, and attempt to commit murder in the first degree or remand for resentencing. Dechant contends his appellate attorney provided ineffective assistance of counsel by not arguing (1) the trial court erred in denying his motion to suppress the recorded statements he made to police detectives in violation of the Washington privacy act, chapter 9.73 RCW, and (2) the court erred in calculating his offender score. Dechant cannot show his appellate attorney provided ineffective assistance of counsel by failing to challenge the decision on the motion to suppress. But because Dechant has shown his appellate attorney provided ineffective assistance of counsel by failing to argue on direct appeal that the federal bank robbery conviction was not comparable to a Washington robbery conviction, we grant the PRP on this ground and remand for resentencing.

The facts are set forth fully in State v. Dechant, No. 72055-4-I (Wash. Ct. App. Mar. 14, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/720554.pdf, and will be repeated as necessary.

Solicitation To Commit Murder

On January 7, 2013, confidential informant Louis Didomenici told police that Ira David Dechant was unlawfully in the possession of firearms while driving a BMW that Didomenici loaned to him. The police arrested Dechant and seized the firearms. During the search of Dechant at the jail, officers found baggies of methamphetamine and heroin. The State charged Dechant with unlawful possession of a firearm and Violation of the Uniform Controlled Substances Act, chapter 69.50 RCW.

Dechant and Michael Rogers Jr. were housed in the same cell at the King County jail. Rogers was being held on a bank robbery charge. Dechant told Rogers he was angry about the person who "set him up" and asked if Rogers was "willing to take care of the guy." Rogers told Dechant he "would do it for eight thousand" dollars.

Dechant gave Rogers Didomenici's name and drew a map showing where Didomenici lived. Dechant described how he wanted Rogers to kill Didomenici:

> One of the ways was [Dechant] wanted me to take gas and pore it over the guy's head and flip a zippo at him.
> Another way was to shoot the guy and cut his head and hands off.

Dechant told Rogers that his "prodigy" Chuck would give him anything that he needed to kill Didomenici, including a firearm. Dechant gave Rogers a map showing where Chuck lived and described "what [Chuck] looked like."

After the jail moved Dechant to a segregated unit, Rogers reported the plan to kill Didomenici to Seattle Police Department (SPD) Detective Timothy Renihan. Rogers

2

agreed to wear a concealed recording device and talk to Dechant again about the plan to kill Didomenici. During the recorded conversation, Dechant reiterated the details of the plan to kill Didomenici and that Chuck would provide Rogers with a "piece."

Charles "Chuck" Scheulke visited Dechant in the King County jail. Dechant gave Scheulke instructions about the murder and Scheulke took notes. Dechant later called Scheulke to tell him that Rogers would be released from jail soon and to give Rogers anything he needed, including a gun.

Rogers contacted Scheulke on January 29. Rogers was wearing a concealed recording device. Scheulke agreed to show Rogers where Didomenici lived. When Scheulke gave Rogers a gun, the police arrested him.

January 30, 2013 Police Interview of Dechant

On January 30, Detective Renihan and SPD Detective Debra Brown went to the King County jail to ask Dechant if he was "willing to come and talk to us" at SPD headquarters "about a murder." Dechant said he "didn't know anything about a murder," but "[h]e was happy to talk to us" and said, " '[L]et's go.' "

The detectives escorted Dechant to a secure room at SPD headquarters that allowed the police to audio- and video-record the interview. A notice posted on the outside of the interview room door states:

NOTICE!!

YOU ARE IN A SEATTLE POLICE
FACILITY. CONVERSATIONS WITHIN
THIS FACILITY ARE NOT PRIVATE
AND ARE SUBJECT TO MONITORING.



The small interview room has a table and three chairs. Dechant sat in a chair directly facing the video camera. Dechant appears calm and cooperative throughout the interview.

The interview began at 2:42 p.m.[1] Detective Renihan gave Dechant an acknowledgment and waiver of constitutional rights form to review. Dechant looked at the "Explanation of Rights" form while Detective Renihan read the form out loud to Dechant. While reading Dechant his constitutional Miranda[2] rights, Detective Renihan said that "if you're under arrest, uh which you are, you have the right to counsel." Dechant acknowledged he understood his rights and signed the Explanation of Rights form waiving his rights.

At the beginning of the interview, Detective Renihan told Dechant that the detectives did not want to talk to him about the current charge of unlawful possession of a firearm, "we want to talk to you about something new, . . . like we told you, uh, we want to talk to you about . . . a murder." Detective Brown interrupted to ask whether Detective Renihan wanted to get a "back up recorder."

| | |
|---|---|
| BROWN: | Tim, do you want to get a back up recorder? |
| RENIHAN: | Um, I don't know, do, do you think we need one? |
| BROWN: | Probably not, but I thought I'd check. |
| RENIHAN: | I mean, if you think we do. |
| BROWN: | I think we're alright. |
| RENIHAN: | OK. |

The video recording shows Dechant look at Detective Brown when she asks the question and then look at Detective Renihan when he responds.

---

[1] The time stamps on the video are approximately five minutes ahead of the times in the transcript of the interview.

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

Detective Renihan showed Dechant a photograph of Louis Didomenici. Dechant said he knew him but did not know where he lived. Detective Renihan told Dechant, "[T]his guy was killed last night." Dechant said, "Well, it served him right" because he was a "snitch."

RENIHAN: Wha, why do you say that?
DECHANT: Cause he ain't no good, he's a snitch, everybody knows he's a snitch.
RENIHAN: Really? What's he snitch on?
DECHANT: Snitches from narcotics, everybody with narcotics.
RENIHAN: And what's that based on? I mean, what, why are you saying that? Do you know something? You know a case where he's been?
DECHANT: I, everybody I talk to on the streets, says he's a rat.
RENIHAN: OK.
DECHANT: I never believed 'em, he was a rat, but I think that's probably the reason why I'm here, cause he's probably a rat.

Dechant denied talking to anyone "about wanting to kill" Didomenici. Dechant admitted he talked to Scheulke while in jail. The detectives took a short break to let Dechant smoke a cigarette.

After the break, Detective Renihan showed Dechant a note they found after arresting Scheulke that said, " '[O]h, and if you can, Ace will need a piece, money for cigs, a ride, keep him at your place 'til I get out.' " Detective Renihan asked, "What does that mean?" Dechant admitted he knew "Ace" and wrote the note. Dechant insisted "piece" meant "[p]iece of dope." Dechant said he did not know Ace's real name.

Detective Renihan then showed Dechant a four-page letter Scheulke had when he was arrested:

RENIHAN: Let's see, we found one more letter. And, this one again, this one is four pages. This look familiar to you at all? This your handwriting? I highlighted some of the important parts. Cause that, I, to me that seems like that to you? Cause it

5

says car salesman, snitch, owes me six grand, and that's what you were talking about earlier.

DECHANT: Uh hmm. Probably.

RENIHAN: So, I mean this is a interesting part right here. "I need him washed with gas, and light him."

Dechant insisted, "I didn't write this."

I had nothing to do with, with that dude getting, anything happening to him. . . . I, I mean, I would love it if his whole car lot burnt down, and his whole house burnt down, you betcha' I would love it, because he's a rat, I hate rats, but I wouldn't go out and, and, and whack one. It's not my forte', it's not my thing, I'm fifty something years old, you know.

Dechant said, "And if I was going to do it, I'd do it myself, I wouldn't have somebody else go do it."

At 3:38 p.m., Dechant said he wanted to smoke another cigarette. When the interview resumed approximately eight minutes later, Detective Renihan reminded Dechant that the interview was being "audio & video recorded." Dechant acknowledged that he knew the interview was being recorded.

RENIHAN: Time's [3:46 p.m.]. And, uh, I want to remind you again you know, while its audio & video recorded.

DECHANT: Uh hmm.

RENIHAN: That cool?

DECHANT: Yeah.

Detective Renihan told Dechant that he wanted "to go over some of this again."

RENIHAN: Yeah. Are you involved? Or no?

DECHANT: No, I'm not involved.

. . . .

DECHANT: And, I don't need to be going out doing this, I mean, I'm not sad that it happened to the guy, because it probably, he probably deserved it somewhere down the line[.]

RENIHAN: OK.

DECHANT: OK? But my, my thing is I never would have done something like that.

RENIHAN: OK.

6

DECHANT: I would have torched his car lot, I would have torched his house, I would have broke his legs, I would have broke his hands, and that's about as far as I'd a gone with it.

Dechant admitted, "I've had two visits, two visits, no three visits, I had Chuck visit me, my sister visit me, and the, JR the attorney visit me." Detective Renihan told Dechant:

Huh, OK. OK, let's do this then, um, if you could give me, and, and I'm just ask, I just want to make sure that's cool with you, I want to go over these, I want to just go over the letter, and the map one more time, it should take ten or fifteen minutes, I will give you a smoke, and you can sit in here and smoke, I'll give you a Coke. And then uh, I'll come back and we'll do some final questions, and then if you want to go back to the jail. Is that cool?

Dechant said, "Yeah."

Detective Renihan then asked Dechant again about the letter. Detective Renihan told Dechant, "I just want to . . . make sure everything now that I kind of have your relationship with this guy [Louis Didomenici] I want to make sure that it's accurate." Contrary to his earlier denial, Dechant admitted writing the four-page letter.

RENIHAN: OK. Louis, and then this is that part again about Ace, Ace will need a piece, you're saying that [—]
DECHANT: It's dope.
RENIHAN: He needs dope.
DECHANT: You know we call heroin pieces of dope, so.
RENIHAN: OK. Money for cigs, a ride. Where's he gonna' need a ride to?
DECHANT: Probably his dad's house, or somewhere.
. . . .
RENIHAN: OK. This one, this is the other letter here that says the car salesman snitch, six grand, this is where you said I need him washed in gas, dried with a match, so he can't testify, you said washed, mean you washing the car.
DECHANT: I was talking about his car lot.
RENIHAN: Wha-
DECHANT: or his house[.]
RENIHAN: You going to wash his car house with gas, but I mean would you set it on fire? To burn it up or no?

7

DECHANT: Personally me?

RENIHAN: Yeah, what would you do?

DECHANT: I'd torch it.

RENIHAN: OK. But, so are you telling Ace here then, is you telling Ace that's what you want Ace to do? Cause I, I need, that's, I'm trying to figure it out, I need "him[.]" Is "him" Ace?

DECHANT: I don't know what I was writing there man.

Near the end of the interview, Detective Renihan told Dechant Didomenici was "not dead" and Chuck Scheulke was "in custody for it."

RENIHAN: You want to know the real deal?

DECHANT: Yeah.

RENIHAN: Is uh, he's not dead.

DECHANT: See, I knew you guys were trying to sit there and set me up on something?

RENIHAN: No, but Chuck's in custody for it.

DECHANT: Why? What, what did he do?

RENIHAN: He's going to try and kill him.

DECHANT: No he wasn't.

. . . .

DECHANT: Yeah, but for what?

RENIHAN: For trying to have somebody killed.

DECHANT: But I never tried to have nobody killed, see that's the thing.

RENIHAN: Yeah, well.

DECHANT: I wanted him to go fucking burn his cars up, burn his cars. The dude ain't going to testify, he was never going to testify, so why would I want him to kill somebody? I wouldn't, OK? For the case for one, the case is so weak that they have on me, because for one it's all his shit [in the BMW], the dude's shit, uh Louis' crap, um, I mean he even admits bringing it to the police department.

. . . .

DECHANT: All I told, told, told Chuck was to wash his cars and burn 'em with a match. Didn't tell him to hurt the man, didn't tell him anything else.

RENIHAN: Like that letter said? Wash him?

DECHANT: I told him to wash his cars with gas, and burn 'em with a match.

Detective Renihan questioned whether Dechant was being honest. Dechant said he wanted "to talk" but only if the detectives got "rid of all your recorders."

DECHANT: I'm being straight up[.]

8

RENIHAN: No, you're not being totally straight up, we, we, we know, we know uh pretty much everything that happened. We've got recordings, letters, jail phone calls, Chuck, evidence, we have a gun.

DECHANT: You have a gun?

RENIHAN: Yeah. And so I mean, and you, again, you're a smart guy, but you know, if you tell somebody to go take care of somebody.

DECHANT: No, you know what?

RENIHAN: No?

DECHANT: If uh, get rid of all your recorders, I want to talk to you guys man.

RENIHAN: About what? Tell me what we're getting rid of our recorders for?

DECHANT: Just get rid of your recorders, I'll talk to you for a minute.

RENIHAN: About what?

DECHANT: About something.

RENIHAN: OK. Well, unfortunately Ira, um, I don't want to do that, because then, and just hear me out, let's see if we can figure something out, but if I turn off the recorders, you tell us something, and then, we turn 'em back on, then what your defense attorney and everybody else gonna' be like well who knows what the heck he said. It's better to have the recorders on so, it's a accurate record.

DECHANT: Go get me an attorney, bring him in here and I'll talk to you.

After Dechant asked for an attorney, the detectives ended the interview at 4:21 p.m.

Charges

The State charged Scheulke with conspiracy to commit murder and attempted murder of Didomenici in the first degree. The State charged Dechant with solicitation to commit murder, conspiracy to commit murder, and the attempted murder of Didomenici in the first degree. The State also charged Dechant with unlawful possession of a firearm in the second degree and possession of heroin. Dechant waived his right to a jury trial on the charges of unlawful possession of a firearm and possession of heroin. Scheulke pleaded guilty to a reduced charge and agreed to testify at trial.

9

CrR 3.5 Hearing

The court held a CrR 3.5 hearing on admission of the January 30, 2013 police interview. The court admitted the audio and video recording of the interview, a 66-page transcript of the interview, the waiver of rights form signed by Dechant, and photographs of the notice posted on the outside of the interview room door as pretrial exhibits. The State called Detective Renihan and Detective Brown to testify and played portions of the videotaped interview. The trial court advised Dechant of his right to testify. Dechant did not testify.

The State argued the detectives substantially complied with the requirements of RCW 9.73.090(1)(b) of the Washington privacy act, chapter 9.73 RCW, and the statements Dechant made in the interview were admissible. The defense argued that because the detectives did not tell Dechant at the beginning that the interview was being recorded, the detectives did not substantially comply with the requirements of RCW 9.73.090(1)(b).

The trial court denied the motion to suppress the recorded statements. The court concluded the detectives substantially complied with the requirements of RCW 9.73.090(1)(b) and the video recording was admissible at trial.

Trial

At the conclusion of the eight-day trial, the jury found Dechant guilty of solicitation to commit murder in the first degree, conspiracy to commit murder in the first degree, and the attempted murder of Louis Didomenici in the first degree. By special verdict, the jury found Dechant or an accomplice was "armed with a firearm at the time of the

commission of the crime." The court found Dechant guilty of unlawful possession of a firearm and possession of heroin.

At sentencing, the State argued the federal bank robbery conviction counted as 2 points for the offender score. Defense counsel argued the court should add only 1 point to Dechant's offender score because robbery under Washington law is not factually or legally comparable to federal bank robbery. The court ruled the federal bank robbery conviction is "factually comparable" to robbery in the first degree.

Appeal

On appeal, Dechant contended insufficient evidence supported the solicitation, conspiracy, and attempt to commit murder in the first degree convictions and argued the convictions violated double jeopardy. Dechant also argued his attorney provided ineffective assistance of counsel by failing to file a motion to suppress evidence and argue the police did not have consent to search the BMW.

In a statement of additional grounds, Dechant argued the trial court erred by admitting the statements he made during the video recording. Dechant asserted the recording violated RCW 9.73.090(1)(b). We considered and rejected his argument:

> Dechant challenges the court's admission of his recorded custodial statements to a police detective. He claims that his statements were inadmissible because the police officers failed to state on the record at the outset of the interview that they were recording the interview and the State failed to prove that he consented to the recording as required by the Washington privacy act, RCW 9.73.090[(1)](b).
> The trial court concluded that law enforcement properly advised Dechant and he knew that the interview was being recorded. The interview room had clear signage indicating that conversations were not private, and the room was equipped with video and audio recording technology. The officers advised Dechant of his constitutional rights and discussed, in his presence, if they needed to use a backup recorder. At another point during the interview, one of the officers reminded Dechant

11

> that the interview was being recorded. Toward the end of the interview, Dechant told the officers he would talk to them if they ceased recording.
>
> State v. Jones[,95 Wn.2d 616, 628 P.2d 472 (1981),] supports this conclusion. Jones, a juvenile from Canada, claimed that the trial court should have suppressed his postarrest statement because the tape did not begin with the officer informing him that the statement was being recorded, a violation of RCW 9.73.090(1)(b)(i). [Jones, 95 Wn.2d at 617, 619.] The court addressed whether the technical violation of RCW 9.73.090(1)(b)(i) required suppression when it was clear that Jones knew his statement was being recorded. The tape recorder was in plain view, and an officer explained on the tape that he was in the middle of a recording and started a question with " 'for purposes of this tape.' " [Jones, 95 Wn.2d at 627.] The court held that "the tape recording conforms with the statute and is therefore admissible." [Jones, 95 Wn.2d at 627.] Likewise here, the trial court did not err by refusing to suppress Dechant's tape-recorded statement on the grounds that the tape recording did not comply with RCW 9.73.090(1)(b)(i).

Dechant, No. 72055-4-I, slip op. at 16-18.

We affirmed the convictions and the judgment and sentence. Dechant, No. 72055-4-I, slip op. at 1.

Personal Restraint Petition

Dechant timely filed a PRP. Dechant contends his appellate attorney provided ineffective assistance of counsel.

Standard of Review

To be entitled to relief, Dechant must establish either constitutional error that caused actual and substantial prejudice or a nonconstitutional error that constitutes a fundamental defect that results in a complete miscarriage of justice. In re Pers. Restraint of Davis, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004).

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel to help ensure a fair trial. State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011); State v.

Coristine, 177 Wn.2d 370, 375, 300 P.3d 400 (2013). The United States Supreme Court has recognized that a criminal defendant has a right to have effective assistance of counsel on his first appeal of right. Evitts v. Lucey, 469 U.S. 387, 396, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985). A criminal defendant's first opportunity to raise an ineffective assistance of appellate counsel claim is often on collateral review. In re Pers. Restraint of Dalluge, 152 Wn.2d 772, 787, 100 P.3d 279 (2004).

We review ineffective assistance of counsel claims de novo. In re Pers. Restraint of Lui, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). To prevail on an ineffective assistance of counsel claim, a defendant must show both deficient performance and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonableness. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). There is a strong presumption of reasonableness and scrutiny of counsel's performance is highly deferential. McFarland, 127 Wn.2d at 335. To establish prejudice, a defendant must show a reasonable probability that the outcome of the appeal would have differed absent the deficient performance. Grier, 171 Wn.2d at 34. If a defendant fails to establish either deficient performance or prejudice, the ineffective assistance of counsel claim fails. Strickland, 466 U.S. at 697.

To prevail on an ineffective assistance of appellate counsel claim, a petitioner must show (1) the legal issue appellate counsel failed to raise had merit and (2) petitioner was actually prejudiced by the failure to raise or adequately raise the issue. Dalluge, 152 Wn.2d at 787. To establish prejudice, the petitioner must " 'show a reasonable probability that, but for his counsel's unreasonable failure' " to raise a

meritorious legal issue, he would have prevailed on appeal. Dalluge, 152 Wn.2d at 788 (quoting Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000)). The "[f]ailure to raise all possible nonfrivolous issues on appeal is not ineffective assistance." Dalluge, 152 Wn.2d at 787. The "exercise of independent judgment in deciding what issues may lead to success is the heart of the appellate attorney's role." Dalluge, 152 Wn.2d at 787.

The Privacy Act

Dechant contends his appellate attorney provided ineffective assistance of counsel by failing to argue the audio and video recording of the interview violated the requirements of the Washington privacy act. "Evidence obtained in violation of the act is inadmissible for any purpose at trial." State v. Kipp, 179 Wn.2d 718, 724, 317 P.3d 1029 (2014).

RCW 9.73.030(1)(a) states that "[e]xcept as otherwise provided in this chapter, it shall be unlawful" for the State or its agencies to "record any . . . [p]rivate communication . . . without first obtaining the consent of all the participants in the communication." RCW 9.73.090(1)(b) expressly states, "The provisions of RCW 9.73.030 through 9.73.080 shall not apply to police . . . in the following instances." Specifically, video and audio recordings "of arrested persons by police officers responsible for making arrests." RCW 9.73.090(1)(b). In State v. Cunningham, 93 Wn.2d 823, 829, 613 P.2d 1139 (1980), the Washington Supreme Court concluded RCW 9.73.090(1)(b) "is specifically aimed at the specialized activity of police taking recorded statements from arrested persons."

Dechant contends RCW 9.73.030 not RCW 9.73.090 applies because at the interview, he was not under arrest for solicitation, conspiracy, or the attempted murder of Didomenici. Neither the statute, case law, nor the undisputed facts support his argument.

When interpreting a statute, our fundamental goal is to ascertain and carry out the intent of the legislature. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). We must interpret and construe a statute to give effect to the language used in the statute with no portion rendered meaningless or superfluous. State v. Peterson, 174 Wn. App. 828, 856, 301 P.3d 1060 (2013); State v. J.P., 149 Wn.2d 444, 450, 69 P.3d 318 (2003); State v. Delgado, 148 Wn.2d 723, 727, 63 P.3d 792 (2003).

We seek to determine legislative intent solely from the plain language of the statute. State v. Evans, 177 Wn.2d 186, 192, 298 P.3d 724 (2013). "The 'plain meaning' of a statutory provision is to be discerned from the ordinary meaning of the language at issue." State v. Jacobs, 154 Wn.2d 596, 600, 115 P.3d 281 (2005). We assume the legislature means exactly what it says. Delgado, 148 Wn.2d at 727.

RCW 9.73.090 "applies specifically to individuals who have been arrested." State v. Rupe, 101 Wn.2d 664, 683, 683 P.2d 571 (1984). In Rupe, the defendant argued the statements he made to a detective describing the "events leading to the deaths of the two bank tellers" violated RCW 9.73.090. Rupe, 101 Wn.2d at 683. The Washington Supreme Court addressed whether the defendant was arrested for purposes of RCW 9.73.090. Rupe, 101 Wn.2d at 683-86. The court states the determination turns on whether the individual "was free to leave" and whether the confinement was either the initial action in the criminal prosecution or "confinement for

15

future accountability." Rupe, 101 Wn.2d at 684. In Rupe, the court concluded the defendant was arrested for purposes of RCW 9.73.090 when he confessed to the crimes. Rupe, 101 Wn.2d at 684. "The combination of defendant's confession and the mounting circumstantial evidence against him . . . were sufficient evidence to establish probable cause to prevent defendant from leaving the police station." Rupe, 101 Wn.2d at 684.

Here, the undisputed record establishes RCW 9.73.090 controls. Although Dechant was free to terminate the interview with the detectives at any time, he was under arrest and in custody at the King County jail on pending charges for unlawful possession of a firearm and heroin. The plain and unambiguous language of RCW 9.73.090(1)(b) allows the police to interview an arrested person and to video and audio record the interview.

Substantial Compliance with the Privacy Act

Even if RCW 9.73.090 applies, Dechant claims the trial court erred in ruling SPD Detective Renihan substantially complied with the requirements of the statute.

RCW 9.73.090(1)(b) states, in pertinent part:

[V]ideo and/or sound recordings shall conform strictly to the following:
    (i) The arrested person shall be informed that such recording is being made and the statement so informing him or her shall be included in the recording;
    (ii) The recording shall commence with an indication of the time of the beginning thereof and terminate with an indication of the time thereof;
    (iii) At the commencement of the recording the arrested person shall be fully informed of his or her constitutional rights, and such statements informing him or her shall be included in the recording;
    (iv) The recordings shall only be used for valid police or court activities.

In Jones, 95 Wn.2d at 627, the Washington Supreme Court held the police did not violate the statute even though the interview did not contain the required statement that a recording was being made. The court concluded that under the circumstances, "it is clear that not only did appellant know that the recording was being made but that the tape contains an adequate statement that a tape recording was being made." Jones, 95 Wn.2d at 627.

> Although the . . . police[ ] in the present case did not begin the tape with a statement that the recording was being made, not only was the tape recorder sitting on the table directly in front of appellant, but also the officer began one of his questions by saying "for purposes of this tape[.]" In addition, in the middle of the tape recording session, the telephone rang and the officer spoke into the receiver, saying "I'm right in the middle of an interview. . . . I'm on recording now, and this is all going on tape."

Jones, 95 Wn.2d at 627.[3] Citing Jones, the court in Rupe states we must examine the circumstances to determine whether the police substantially complied with the requirements of the statute:

> In Jones, we found that the statute was not violated even though the tape did not contain the required statement that a recording was being made. In coming to that conclusion, this court looked to the circumstances surrounding the taping.

Rupe, 101 Wn.2d at 681. The court in Rupe concluded the circumstances established substantial compliance:

> Taken together, the only defect in the taping procedure of these statements was the failure to specify the starting time of the polygraph examination. All of the other requirements were met. The polygraph statement was preceded by an advisement of defendant's constitutional rights and a notification of the fact that the statement was being taped.

Rupe, 101 Wn.2d at 685.

---

[3] Last alteration in original.

17

Here, the trial court concluded the detectives substantially complied with the requirements of RCW 9.73.090(1)(b). We review a trial court's decision on a motion to suppress to determine whether the findings are supported by substantial evidence and whether those findings, in turn, support the conclusions of law. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003); State v. Vickers, 148 Wn.2d 91, 116, 59 P.3d 58 (2002); State v. Broadaway, 133 Wn.2d 118, 130-31, 942 P.2d 363 (1997). Substantial evidence is evidence sufficient to persuade a reasonable person of the truth of the finding. Vickers, 148 Wn.2d at 116. This court considers unchallenged findings of fact as true on appeal. State v. Gaines, 154 Wn.2d 711, 716, 116 P.3d 993 (2005). We review conclusions of law de novo. State v. Duncan, 146 Wn.2d 166, 171, 43 P.3d 513 (2002).

Substantial evidence supports the trial court's conclusion that the detectives substantially complied with the requirements of RCW 9.73.090(1)(b). The court found Dechant was arrested and in jail on other charges when the detectives asked him to "talk . . . about a murder." Dechant was "in custody in an unrelated matter" and although "free to not to talk to the officers," he was "not free to leave in general." The court found Detective Renihan advised Dechant of his constitutional rights:

> Once in the holding cell, Detective Renihan advises [Dechant] of his rights and he uses State's Exhibit Number 6[, the Explanation of Rights form,] and they ask him to sign those rights.
> [Dechant] says that State's Exhibit Number 6 was an accurate copy of the rights that he read. He went through it with [Detective Renihan], both from hearing and seeing — the tape and hearing the testimony. I will just say that it was clear to this Court that the detective read through the Exhibit Number 6 to the defendant.

The court found Dechant "did sign the form. He didn't ask any questions about it. He appeared to understand his rights. He agreed to speak with the detectives."

The court found that "just a few minutes after [Dechant] was advised of his Miranda rights within a minutes or so," Detective Brown asked Detective Renihan if " 'you want to have a backup recorder, do you think that we need one?' "

The court found that "[a]bout an hour later after a break Detective Renihan at [3:46 p.m.] reminds the defendant that 'this is an audio and video recording.' The defendant says 'yes.' "

> Again, I have observed the tape because the prosecutor played it. I will say as a finding that it appeared from [Dechant's] indication of, "yeah," or ["]ah-hum," that he was not — he didn't act at all surprised. He appeared to understand and acknowledge that he had been videotaped all along.

The court found:

> Later, near the end of the tape, [Dechant] indicated that it was when the detective — I haven't read the entire transcript. I just know what the portions that you have played. But it was on page 64 of the transcript when the detective starts telling him that he hasn't been straight up.
> "We know everything that happened" and starts confronting [Dechant] a little. The defendant says, "if you get rid of your recorders, I want to talk to you guys, man."
> The detective says "about what? Tell me what we are getting rid of our recorders for."
> The defendant says "just get rid of your recorders and I will talk to you for a minute."

The trial court concluded under "the circumstances of the interview," there was "substantial compliance" with RCW 9.73.090(1)(b):

> [U]nder Jones and Rup[e] there is a substantial compliance test. It is really that — I am going to quote from Rup[e]. It says, "[I]n coming to th[at] conclusion[,] this [c]ourt looked to the circumstances surrounding the taping["] and they looked at the circumstances in that case.[ ] [Rupe, 101 Wn.2d at 681.]
> Here, I think that you need to look at the circumstances in this case. You have Detective Brown asking right in the beginning, really, of the interview "do we need another recorder?" That is an implicit "we are recording."

19

It might not be as strong as we would like. The direct statement "we are recording you," but it is said right in front of the defendant. It is right in the beginning of the conversation.

Then with, in the middle of the conversation, you have Detective Renihan reminding [Dechant] that it is an audio and video — visually recorded videotaped. The defendant responded in a way, if you look at the tape, where he is not at all surprised, which indicates that he knew that it was being recorded. That is indicated certainly — for certainty for questions at the end of the tape where he says "turn off the recorder, I will talk to you."

This is not where the Court has to question whether the defendant knew that he was being recorded. He told us that he knew he was being recorded right in the interview.

So, I think from looking at the circumstances of the interview, we can conclude that the defendant was well aware that it was being recorded. That is the purpose of notice.

So, I do believe that there has been substantial compliance in this case. I will allow the tape and the statements.

The uncontroverted record supports the findings of fact and those findings support the conclusion that the recorded interview substantially complied with the requirements of RCW 9.73.090(1)(b). At the beginning of the interview, Detective Renihan advises Dechant of his constitutional rights on the record. Detective Renihan explicitly states for purposes of the record the time the interview begins, the start and stop times for breaks, and the time the interview ends. The findings support the conclusion that Dechant knew from the beginning that the detectives were recording the interview. The record also establishes that after Detective Renihan explicitly states that the interview was being recorded, Dechant makes the same incriminating statements he made before that advisement.[4]

---

[4] Dechant contends the notice on the door of the interview room did not clearly inform him the interview would be recorded. Dechant submitted a declaration as an exhibit to his reply brief that states he never saw "any sign" on the door. But the record establishes the trial court did not rely on the notice posted on the door in concluding there was substantial compliance with the statutory requirements. The court specifically found, "There is no testimony whether [Dechant] saw the sign or not."

20

We conclude Dechant cannot establish ineffective assistance of appellate counsel by not arguing on direct appeal that the admission of the audio- and video-recorded interview violated the privacy act.

Offender Score

Dechant contends his appellate attorney provided ineffective assistance of counsel by not assigning error to the offender score and arguing the prior conviction for federal bank robbery was not comparable to robbery in the first degree under Washington law and the court erred in adding 2 points to his offender score. Dechant contends his federal bank robbery conviction under 18 U.S.C. § 2113 is not comparable to the Washington crime of robbery.

We review the calculation of the offender score de novo. State v. Olsen, 180 Wn.2d 468, 472, 325 P.3d 187 (2014). The State bears the burden of proving by a preponderance of the evidence that the Hawaii federal bank robbery conviction is comparable. Olsen, 180 Wn.2d at 472. Under the legal prong, the court compares the elements of the out-of-state conviction to the Washington crime. Olsen, 180 Wn.2d at 472; see also RCW 9.94A.525(3) (federal convictions "shall be classified according to the comparable offense definitions and sentences provided by Washington law").

The State concedes the federal bank robbery conviction is not legally comparable. We accept the concession as well taken. RCW 9.94A.525(3) states that if there is "no clearly comparable offense under Washington law," the offense "shall be scored as a class C felony equivalent if it was a felony under the relevant federal statute."[5]

---

[5] Dechant concedes that the federal conviction counts as 1 point in calculating the offender score under RCW 9.94A.525(3).

In In re Personal Restraint of Lavery, 154 Wn.2d 249, 255-56, 111 P.3d 837 (2005), the Washington Supreme Court held the crime of federal bank robbery under 18 U.S.C. § 2113 is not legally comparable to robbery in Washington because federal bank robbery is a general intent crime and robbery in Washington requires proof of specific intent to steal. The court states the intent to steal is an essential nonstatutory element of robbery. Lavery, 154 Wn.2d at 255.

The State argues the federal bank robbery conviction is factually comparable because Dechant pleaded no contest to the Hawaii indictment. Where, as here, the foreign statute is broader than the Washington statute, the court determines whether the defendant's conduct would have violated the comparable Washington statute. Olsen, 180 Wn.2d at 473. Our consideration is limited to facts that were clearly charged and admitted, stipulated, or proved to a trier of fact. Lavery, 154 Wn.2d at 258 ("Any attempt to examine the underlying facts of a foreign conviction, facts that were neither admitted or stipulated to, nor proved to the finder of fact beyond a reasonable doubt in the foreign conviction, proves problematic.").

18 U.S.C. § 2113(a) defines "federal bank robbery," in pertinent part:

> Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association.

In accord with 18 U.S.C. § 2113(a), the indictment charging Dechant with federal bank robbery alleged:

> That on or about October 9, 1995, in the District of Hawaii, the Defendant, Ira [Dechant] did by force and violence and by intimidation take from the person in the presence of another money belonging to and in the care of, custody, control, management and possession of the Bank of Hawaii.

22

Here, as in Lavery, in pleading no contest to the indictment, Dechant neither admitted nor stipulated to facts that established specific intent to steal. As in Lavery, we conclude the federal bank robbery conviction is not factually comparable to robbery in Washington. We conclude the court erred by adding 2 points to the offender score for the federal bank robbery conviction. Because appellate counsel provided ineffective assistance of counsel by not challenging the offender score calculation, we grant the PRP on this ground and remand for resentencing. Dalluge, 152 Wn.2d at 787.

Because Dechant cannot establish ineffective assistance of appellate counsel by failing to argue admission of statements in the recorded interview violated the privacy act, we deny the PRP on this ground. However, because Dechant establishes his appellate attorney provided ineffective assistance of counsel by not challenging the calculation of his offender score, we grant the PRP on this ground and remand for resentencing.

Pelindle, J.

WE CONCUR:

Chun, J.

Andrus, J.